**ROADWAY PACKAGE SYSTEM, INC.,**

v.

**Scott KAYSER d/b/a Quality Express Scott Kayser, Appellant.**

No. 99–1907.

United States Court of Appeals, Third Circuit.

Argued Sept. 13, 2000.

Filed June 7, 2001.

Laurence I. Tomar (Argued), Ballow & Tomar, Fairless Hills, PA, Counsel for Appellant.

Frank C. Botta, Ellen P. Milcic (Argued), Thorp, Reed & Armstrong, LLP, Pittsburgh, PA, Counsel for Appellee.

Before: BECKER, Chief Judge,
NYGAARD and AMBRO, Circuit Judges.

## OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal from an order of the District Court vacating an arbitrator's award. Plaintiff Roadway Package System, Inc. (RPS) ships small packages for corporate clients. "Independent linehaul contractors," such as Defendant Scott Kayser, assist in its operations. RPS terminated Kayser's contract in 1998, alleging that he had failed to fulfill his obligations under the Linehaul Contractor Operating Agreement (LCOA), which governed their association. Kayser exercised his contractual right to demand arbitration and was awarded substantial damages. RPS then brought suit in the District Court for the Eastern District of Pennsylvania, asking the court to vacate the award. Applying the vacatur standards set forth in the Federal Arbitration Act (FAA), the District Court granted the motion on the grounds that the arbitrator exceeded the scope of his authority. We will affirm.

Kayser's appeal requires us to decide two questions of considerable significance for the law governing arbitration, both of which are currently the subject of circuit-splits. The first question is whether contracting parties may opt out of the FAA's default vacatur standards and fashion their own. Because the LCOA is a "contract evidencing a transaction involving commerce," 9 U.S.C. § 2, the FAA governs this case. Resolving a question previously reserved by this Court, we first hold that the FAA permits parties to contract for vacatur standards other than the ones provided in the FAA. The FAA sets out "a substantive rule applicable in state as well as federal courts," *Southland Corp. v. Keating*, 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), but its rule is simply that courts must enforce the terms of private arbitration agreements.

The second question we must decide involves the conceptually complex issue of how courts should determine whether parties have contracted out of the FAA's default rules. The LCOA contains a generic choice-of-law clause, stating that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." Kayser submits that we should read this clause as expressing a desire to opt out of the FAA's default regime and to incorporate arbitration rules borrowed from Pennsylvania law. We disagree.

We first explain why the choice-of-law clause sheds little, if any, light on the parties' actual intent. The issue before us is simply a matter of contract construction rather than one of choice-of-law. Because choice-of-law clauses are designed to deal with a different issue from the one with which we are currently faced, and because few federal statutes other than the FAA permit parties to contract out of their requirements, we do not read the LCOA's choice-of-law clause as evidencing a clear intent to displace the FAA's default regime. Our conclusion is consistent with *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), and though *Volt Information Sciences, Inc., v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989), may appear to the contrary, our review of that opinion, the Supreme Court's subsequent decision in *Mastrobuono*, and the unanimous holdings of six other Courts of Appeals convince us that *Volt* is distinguishable.

Because the presence of a generic choice-of-law clause tells us little (if anything) about whether contracting parties

intended to opt out of the FAA's default standards and incorporate ones borrowed from state law, we must announce and apply a default rule. We hold that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default regime. This rule will: (1) ensure that parties who have never thought about the issue will not be found to have elected out of the FAA's default regime; (2) be comparatively simple for arbitrators and district courts to apply; and (3) preserve the ability of sophisticated parties to opt out. Applying our rule to this case, we conclude that the District Court was correct to apply the FAA's vacatur standards.

Analyzing the issue under those standards, we hold that the District Court correctly determined that the arbitrator exceeded the scope of his authority. Though our cases caution against exploiting an ambiguity in an arbitrator's award to support an inference that he or she exceeded his or her powers, they also establish that a reviewing court is not precluded from examining an arbitrator's statement of reasons. In this case, the arbitrator's written opinion makes crystal clear that his decision was based on the fact that he thought that RPS's procedures for notifying Kayser of its dissatisfaction with his performance were unfair. Yet the intrinsic fairness of RPS's procedures was not before the arbitrator—he was empowered to decide *only* whether the termination was within the terms of the LCOA. Accordingly, we conclude that the District Court was correct in vacating the award, and will, therefore, affirm its order.

## I.

### A.

RPS and Kayser entered into the LCOA in 1996. It required Kayser to conform to specified service and safety standards, and permitted early termination if he did not meet them. RPS terminated the LCOA in mid 1998, alleging that Kayser had repeatedly failed to fulfill his obligations under the contract.

The LCOA is forty-one pages long and is divided into sixteen sections. This appeal implicates Sections 9 and 16. Section 9.3 binds the parties to arbitrate disputes and outlines the procedures for doing so. Its introductory sentence provides:

> In the event that RPS acts to terminate this Agreement ... and [Kayser] disagrees with such termination ... then each such disagreement (but no others) shall be settled by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association....

Section 9.3(e) states:

> The arbitrator shall have the authority only to conclude whether the termination of [Kayser] was within the terms of this Agreement, to deter mine damages if required to do so under this subparagraph, and to provide for the division of the expenses of the arbitration between the parties.... If the arbitrator concludes that the termination was not within the terms of this Agreement, then, at the option of RPS ... (2) [Kayser] shall nevertheless be terminated, and ... shall be entitled to damages equal to the arbitrator's determination of what [Kayser's] net earnings ... would have been during the period between the date of termination to the last day of the term of this Agreement, (without any renewals). [Kayser] shall have no claim for damages in any other amount, and the arbitrator shall have no power to award punitive or any other damages.

Finally, Section 9.3(f) specifies:

> The arbitrator shall have no authority to alter, amend or modify any of the terms

and conditions of this Agreement (including by application of estoppel, waiver, or ratification), and further, the arbitrator may not enter any award which alters, amends or modifies the terms or conditions of this Agreement in any form or manner (including by application of estoppel, waiver, or ratification).

Section 16 contains a generic choice-of-law provision, stating that the LCOA "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania."

### B.

Following RPS's termination of the LCOA, Kayser demanded arbitration, which was conducted before William Mechmann. Kayser sought $141,961.40 in total damages: $129,930.00 for projected lost profits plus $12,031.40 for expenses incurred in purchasing a tractor-trailer at RPS's request. Arbitrator Mechmann ruled for Kayser and awarded $174,431.15 in damages—$32,469.75 more than Kayser originally requested.

Mechmann's written decision consists of twelve short paragraphs. The first is irrelevant to this appeal. The second paragraph acknowledges that "[t]he arbitrator's authority is set forth in Section 9.3(e) [of the LCOA]." The third characterizes the "[t]he main question" before Mechmann as whether RPS's termination of the LCOA was "wrongful or proper." The fourth, fifth, sixth, and seventh paragraphs of the opinion focus on RPS's procedures for notifying independent contractors when it is dissatisfied with their performance and discuss the manner in which those procedures played out in Kayser's case. They read as follows:

The RPS procedure for dealing with performance by its contractors is commendable. [sic] Documentation of breaches by the contractors are written

up by Local Managers. This is only verbalized to the contractor. . . .

[Kayser] bought larger equipment at the behest of RPS and took on that financial responsibility, but when his performance was unsatisfactory, he only received verbal warnings until the point of termination which of course, is written. He is aggressive with warehouse people in several locations to get in and out to serve other . . . customers. When his own driver employees were remiss, he replaced them once RPS brought a problem to his attention. He was an aggressive business man in a very competitive environment. Verbal warnings did not persuade him of RPS's serious concerns.

Based on many years of dealing with industrial relations jurisprudence in American business, I find the RPS system lacking in due process toward [Kayser].

Here the RPS system, which I respect, blinds itself into thinking—as long as we document our side of the business arrangement, that is sufficient. For a reputable business organization that performs an important service in the economy, that is inadequate.

Paragraph eight gives Mechmann's conclusion:

I conclude that this was wrongful termination by RPS of the LCOA and determine the contractor's earnings (after payment of all expenses which are borne by contractor) according to LCOA Section 9.3(e). As Section 9.3(e) provides, the damage period here runs from 05/21/98, the date of RPS's termination of the LCOA to 01/25/99, the normal date of termination of the present Agreement (LCOA).

Paragraph nine, without explanation, sets Kayser's damages at $174,431.15. Para-

graphs ten, eleven, and twelve are not relevant to this appeal.

## C.

RPS then filed suit, asking the District Court to vacate or modify the arbitrator's award.[1] The District Court granted RPS's motion, holding that: (1) the FAA, not Pennsylvania law, supplied the standards for judicial review of the arbitrator's decision; and (2) the arbitrator had exceeded his authority under the contract. In light of this conclusion, the Court did not reach RPS's other proffered bases for vacatur. Kayser appeals. We have appellate jurisdiction under 28 U.S.C. § 1291. We re-

view a district court's ruling on a motion to vacate an arbitration award de novo. *See Kaplan v. First Options of Chicago Inc.*, 19 F.3d 1503, 1509 (3d Cir.1994).

## II.

■ We must first decide whether the District Court properly applied the FAA's vacatur standards or whether it should have, as Kayser submits, used those laid out in the Pennsylvania Uniform Arbitration Act (PUAA). For reasons we set forth in the margin, the answer to this question could be quite important to the ultimate disposition of this case.[2] We have

1. The Federal Arbitration Act does not create federal question jurisdiction. *See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25 n. 32, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). But because RPS is a Delaware corporation and Kayser is a citizen of New Jersey (and because the amount in controversy requirement is met in this case), the District Court had diversity jurisdiction under 28 U.S.C. § 1332.

2. The FAA lists four circumstances where a court may grant vacatur and three under which it may correct or modify an award. Vacatur is governed by 9 U.S.C. § 10(a). It provides that a court may vacate an award if: (1) it "was procured by corruption, fraud, or undue means," *id.* § 10(a)(1); (2) the arbitrator was "partial[ ] or corrupt[ ]," *id.* § 10(a)(2); (3) the arbitrator unjustifiably refused to postpone the hearing, refused to consider "evidence pertinent and material to the controversy," or engaged in any other "misbehavior" that prejudiced the rights of a party, *id.* § 10(a)(3); or (4) the arbitrator "exceeded[his or her] powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made," *id.* § 10(a)(4). Some courts, including this one, have also recognized additional, nonstatutory bases upon which a reviewing court may vacate an arbitrator's award under the FAA. *See generally Tanoma Mining Co. v. Local Union No. 1269*, 896 F.2d 745, 749 (3d Cir.1990) (recognizing that an award may be set aside if it displays "manifest disregard for the law"); *Swift Indus., Inc.*

*v. Botany Indus., Inc.*, 466 F.2d 1125, 1134 (3d Cir.1972) (noting that an arbitrator's award must meet the test of fundamental rationality). Correction and modification under the FAA are covered in 9 U.S.C. § 11, which empowers courts to act: "(a) Where there was an evident material miscalculation of figures or an evident material mistake in the description of any person, thing, or property referred to in the award[; or] (b) Where the arbitrators have awarded upon a matter not submitted to them. . . . "

Pennsylvania arbitration law is governed by the PUAA, which sets forth two discrete regimes. The first is known as "statutory arbitration," under which the standards for vacatur, modification, and correction parallel almost perfectly those of the FAA. *Compare* 42 Pa. Con. Stat. § 7314(a) (governing vacatur), *and id.* § 7315(a) (covering modification and correction), *with* 9 U.S.C. § 10(a) (vacatur) *and id.* § 11 (modification and correction). The second regime is known as "common law arbitration." Judicial power to set aside common law arbitration awards is sharply circumscribed. *See* 42 Pa. Con. Stat. § 7341 (stating that such awards "may not be vacated or modified unless it is clearly shown that a party was denied a hearing or that fraud, misconduct, corruption or other irregularity caused the rendition of an unjust, inequitable or unconscionable award"). The PUAA provides that an agreement to arbitrate "shall be conclusively presumed" to be a common law arbitration "unless the agreement to arbitrate is in writing and expressly provides for" statutory arbitration pursuant

no trouble in determining that this case is governed by the FAA. Subject to a few exceptions not implicated here, the statute applies to any "written provision in any ... contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction." 9 U.S.C. § 2. This language "extend[s] the Act's r each to the limits of the Congress' Commerce Clause power[.]" *Allied–Bruce Terminix Cos., Inc. v. Dobson*, 513 U.S. 265, 268, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). The agreement to arbitrate in this case-one between citizens of different states and involving a contract for the delivery and pick-up of packages that have been or will be shipped interstate—was unquestionably within Congress' power to reach under the Commerce Clause.

Our inquiry is not ended, however, simply because we have concluded that the FAA applies. Congress enacted the FAA "to overcome courts' refusals to enforce agreements to arbitrate." *Id.* at 270, 115 S.Ct. 834. The statute's ultimate purpose is to enforce the terms of private arbitration agreements. See 9 U.S.C. § 2 (providing that such agreements "shall be valid, irrevocable, and enforceable, save upon grounds as exist at law or in equity for the revocation of any contract"); *see also Dean Witter Reynolds Inc. v. Byrd*, 470 U.S. 213, 220, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985) (observing that the statute "was motivated, first and foremost, by a congressional desire to enforce agreements into which parties had entered"). Though the FAA generally embraces a "proarbitration policy," this policy "does not operate without regard to the wishes of the contracting parties." *Mastrobuono v.*

*Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 57, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995). Thus, if parties contract to arbitrate pursuant to arbitration rules or procedures borrowed from state law, the federal policy is satisfied so long as their agreement is enforced. *See Volt Info. Sci., Inc., v. Board of Trustees of Leland Stanford Junior University*, 489 U.S. 468, 478, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989).

The foregoing does not mean that agreements specifying that arbitration will be conducted pursuant to state rules or procedures cease being subject to the FAA; it means simply that the FAA permits parties to "specify by contract the rules under which ... arbitration will be conducted." *Id.* at 479, 109 S.Ct. 1248. When a court enforces the terms of an arbitration agreement that incorporates state law rules, it does so not because the parties have chosen to be governed by state rather than federal law. Rather, it does so because *federal law* requires that the court enforce the terms of the agreement. *Cf. Mastrobuono*, 514 U.S. at 58, 115 S.Ct. 1212 (inquiring "what the contract has to say about the arbitrability of petitioner's claim for punitive damages" rather than whether the agreement was controlled by a New York rule barring arbitrators from awarding them).

Having previously reserved the threshold question, *see Apex Fountain Sales, Inc. v. Kleinfeld*, 818 F.2d 1089, 1094–95 & n. 4 (3d Cir.1987), we now hold that parties may agree that judicial review of an arbitrator's decision will be conducted according to standards borrowed from state law. The FAA creates "a substantive rule applicable in state as well as federal courts,"

---

to the relevant statutory chapter. *Id.* § 7302(a). Neither the LCOA's arbitration clause nor its choice of law clause mentions the PUAA (much less a particular chapter), so this would be a common law arbitration if

Pennsylvania standards apply. And because the PUAA's vacatur standards for common law arbitration awards are so much narrower than the FAA's, the choice of standards issue could well be dispositive in this case.

*Southland Corp. v. Keating,* 465 U.S. 1, 16, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984), but *Volt* and *Mastrobuono* clarified that its rule is simply that courts must enforce the terms of arbitration agreements. We now join with the great weight of authority and hold that parties may opt out of the FAA's off-the-rack vacatur standards and fashion their own (including by referencing state law standards).[3] This holding makes it necessary for us to decide a truly difficult question—whether Kayser and RPS did so in this case.

### III.

■ We first consider whether RPS and Kayser manifested a clear intent that any judicial review of the arbitrator's award would be conducted pursuant to standards borrowed from Pennsylvania law. Though our ultimate goal is to effectuate their intent, we have little evidence with which to work. Section 9.3 of the LCOA binds them to resolve any disputes "by arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association." Section 16 directs that the LCOA "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." The LCOA itself says nothing about the issue before us, and there is no extrinsic evidence that RPS and Kayser gave the matter any consideration. All we have to guide us, therefore, is an arbitration clause and a generic choice-of-law clause.

We do not believe that provisions such as these demonstrate a clear intent to displace the FAA's vacatur standards and replace them with ones borrowed from Pennsylvania law. Choice-of-law clauses are ubiquitous in commercial agreements, and with good reason. Contract law is mostly state law, and it varies from state to state. As a result, parties to commercial agreements often care a great deal about which state's law will govern their association. And because modern choice-of-law doctrines tend to place great weight on intent, contracting parties have an incentive to include choice-of-law clauses in their agreements. Commercial parties often also bargain for arbitration clauses, hoping to benefit from arbitration's purported advantages over litigation. As a result, many commercial contracts include both choice-of-law and arbitration clauses.

When required to determine the legal standards governing a particular controversy, courts typically confront two choice-of-law questions. The first is the horizontal question: whether the laws of State X or State Y supply the relevant rule of decision. Choice-of-law doctrines (and, consequently, choice-of-law clauses) speak to this issue. The second choice-of-law question that courts face is the vertical one: whether the rule of decision is supplied by the laws of State X or by federal law. Judge-made choice-of-law doctrines (and, accordingly, attempts by contracting parties to influence their application with choice-of-law clauses) have no applicability

**3.** *See, e.g., LaPine Tech. Corp. v. Kyocera Corp.,* 130 F.3d 884, 888 (9th Cir.1997); *Syncor Int'l Corp. v. McLeland,* No. 96–2261, 1997 WL 452245, at *6–*7 (4th Cir., Aug.11, 1997) (per curiam) (unpublished opinion); *Gateway Tech., Inc. v. MCI Telecomm. Corp.,* 64 F.3d 993, 996–97 (5th Cir.1995); *M&L Power Servs., Inc. v. American Networks Int'l,* 44 F.Supp.2d 134, 141 (D.R.I.1999); *New England Util. v. Hydro–Quebec,* 10 F.Supp.2d 53, 63 (D.Mass.1998); *Flexible Mfg. Sys. v. Super*

*Prods. Corp.,* 874 F.Supp. 247, 248–49 (E.D.Wis.1994); *Flight Sys. v. Paul A. Laurence Co.,* 715 F.Supp. 1125, 1127–28 (D.D.C. 1989). *But see UHC Management Co. v. Computer Sciences Corp.,* 148 F.3d 992, 997 (8th Cir.1998) ("It is not clear ... that parties have any say in how a federal court will review an arbitration award when Congress has ordained a specific, self-limiting procedure for how such review is to occur.").

to answering this question because the relevant rule is supplied by the Constitution itself: a valid federal law preempts any state law purporting to regulate the same issue. *See* U.S. Const. Art. VI.

The issue before us, however, is not one of choice-of-law or preemption—it is simply a matter of contract construction. No one contests that were this matter governed by state law, then the relevant rule would be supplied by the laws of the Commonwealth of Pennsylvania. But, as we have explained, this case is *not* governed by state law—it is governed by federal law. The only reason we must decide whether to apply federal or state standards in this case is because the FAA permits parties to "specify by contract the rules under which ... arbitration will be conducted." *Volt*, 489 U.S. at 479, 109 S.Ct. 1248. The issue in this case is whether the LCOA's generic choice-of-law clause should be read as specifying that any judicial review of the arbitrator's decision should be conducted according to the standards set forth in Pennsylvania arbitration law instead of those set out in the FAA.

We decline to construe the choice-of-law clause in this case as evidencing a clear intent to incorporate Pennsylvania's standards for judicial review into the LCOA. As we explained above, choice-of-law clauses are generally intended to speak to an issue wholly distinct from the one with which we are currently faced. Moreover, because few (if any) federal statutes other than the FAA even *permit* parties to opt out of the standards contained in them, we are confident that this particular issue rarely occurs to contracting parties *ex ante*.

We find support for our conclusion in *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), which involved a dispute between a securities broker and two of its customers. The parties had agreed to resolve any disputes by arbitration and had indicated a desire to have their agreement "governed by the laws of the State of New York." Though the FAA permits arbitrators to award punitive damages, the question before the Supreme Court was whether the parties had intended to incorporate into their agreement a New York rule that barred arbitrators from awarding them.

The Court began by examining the choice-of-law clause "in isolation." *Id.* at 59, 115 S.Ct. 1212. It noted that the clause could "reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship," *id.*, i.e., whether to apply the laws of New York or those of another state. If this reading was the correct one, the Court observed, then "there would be nothing in the contract that could possibly constitute evidence of an intent to exclude punitive damages claims." *Id.* The Court also stated that *even if* the choice-of-law clause was intended to be "more than a substitute for ordinary conflict-of-laws analysis" it still "might not preclude the award of punitive damages because New York allows its courts, though not its arbitrators, to enter such awards." *Id.* Because of this, the Court reasoned that "the provision might include only New York's substantive rights and obligations and, not the State's allocation of power between alternative tribunals." *Id.* at 60, 115 S.Ct. 1212.

Though never resolving which interpretation of the choice-of-law clause was the best one, the Court squarely held that it did not *clearly* evidence an intent to opt out of the federal default rule that arbitrators may award punitive damages and replace it with one borrowed from New York

law that they may not award them. *See id.* (remarking that the choice-of-law clause was "not, in itself, an unequivocal exclusion of punitive damages claims"); *see also id.* at 62, 115 S.Ct. 1212 ("*At most,* the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." (emphasis added)). *Mastrobuono* thus supports our conclusion that the LCOA evidences no clear intent to displace the FAA's default standards for judicial review and to replace them with those borrowed from Pennsylvania law.

Our conclusion that RPS and Kayser have expressed no clear intent as to whether the District Court should have applied federal or state vacatur standards is not undermined by *Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University,* 489 U.S. 468, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989). In that case, the underlying contract included both an arbitration clause and a choice-of-law clause. *See id.* at 470, 109 S.Ct. 1248. A California court interpreted the contract to mean that the parties had *intended* to incorporate California's arbitration rules into their agreement, *see id.* at 471–73, 109 S.Ct. 1248, and the Supreme Court of the United States affirmed. Though the contractor "devote[d] the bulk of its argument to convincing [the Supreme Court] that the [California court had] erred in interpreting the choice-of-law clause," it stressed that "*the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review.*" *Id.* at 474, 109 S.Ct. 1248 (emphasis added). The Court acknowledged that it might have needed to review the state courts' interpretation had that interpretation infringed upon federal rights, but explained that the only "right" conferred by the FAA is to have private arbitration agreements enforced according to their terms. *See id.* at 474–76, 109 S.Ct. 1248. And, said the Court, because the California courts had found that the parties meant to incorporate the California rules *into their agreement,* applying those rules to their case was perfectly consistent with the policies of the FAA. *See id.* at 475, 109 S.Ct. 1248.

We do not view *Volt* as offering guidance as to how generic choice-of-law clauses *should* be interpreted; rather, the Court merely followed its obligation to defer to state court constructions of private agreements in cases where no federal rights are at stake. This supposition is supported by *Mastrobuono,* where the Court was reviewing a federal court's construction of a choice-of-law clause. Responding to Justice Thomas's dissent, which relied heavily on *Volt,* the Court clarified that in that case it had not construed the contract *de novo. See Mastrobuono,* 514 U.S. at 60 n. 4, 115 S.Ct. 1212. Instead, said the Court, it had "deferred to the California court's construction of its own State's law." *Id.*

Our understanding of *Volt* is bolstered by case law from our sister circuits. Six other Courts of Appeals have expressly considered the relationship between *Volt* and *Mastrobuono.* All six have unanimously concluded that *Volt* is inapposite when a federal court is unconstrained by the need to defer to state court constructions. *See PaineWebber, Inc. v. Elahi,* 87 F.3d 589, 594 n. 5 (1st Cir.1996); *National Union Fire Ins. Co. v. Belco Petroleum Corp.,* 88 F.3d 129, 134 (2d Cir.1996); *Porter Hayden Co. v. Century Indemnity Co.,* 136 F.3d 380, 383 n. 6 (4th Cir.1998); *Ferro Corp. v. Garrison Indus., Inc.,* 142 F.3d 926, 936 (6th Cir.1998); *UHC Management Co., Inc. v. Computer Sciences Corp.,* 148 F.3d 992, 996 (8th Cir.1998); *Wolsey, Ltd. v. Foodmaker, Inc.,* 144 F.3d

1205, 1212–13 (9th Cir.1998).[4] *Volt* therefore contains nothing that undercuts our conclusion that RPS and Kayser expressed no clear intent to incorporate Pennsylvania standards of judicial review into their agreement.

## IV.

Because the presence of a generic choice-of-law clause tells us little (if anything) about whether contracting parties intended to opt out of the FAA's default standards and incorporate ones borrowed from state law, we need to establish a default rule, and the one we adopt is that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default standards. W e first lay out three considerations that inform our analysis, articulate why the rule we announce today is consistent with them, and show why our rule is in line with case law from both the Supreme Court and six of our sister circuits. We then respond to the alternative approach proposed by Judge Ambro. We conclude by applying our rule to this case.

## A.

▇ Three considerations guide us in formulating a default rule. First, we aim to minimize the frequency with which parties will be found to have opted out of the FAA's default regime when they did not

intend to do so. This guidepost is consistent with the Supreme Court's admonition that the FAA standards control "in the absence of contractual intent to the contrary." *Mastrobuono*, 514 U.S. at 59, 115 S.Ct. 1212. It is also consonant with the FAA's raison d'etre, which is to overcome rules (whether created by state legislatures or by courts) that make it *more difficult* to enforce arbitration agreements. *See Volt*, 489 U.S. at 478, 109 S.Ct. 1248 ("The FAA was designed 'to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate.' ") (quoting *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 219–20, 105 S.Ct. 1238, 84 L.Ed.2d 158 (1985)). We acknowledge that some states provide as much or more protection to arbitration agreements than does the FAA, *see, e.g.*, 42 Pa. Con. Stat. § 7302 *et seq*, but others do not, *see, e.g.*, *Garrity v. Lyle Stuart, Inc.*, 40 N.Y.2d 354, 386 N.Y.S.2d 831, 832, 353 N.E.2d 793 (1976) (construing New York law as precluding arbitrators from awarding punitive damages). The FAA's ultimate goal is to enforce parties' actual bargains, but any default rule is doomed to be inaccurate in some cases. We must, therefore, decide which error is worse: wrongly concluding that parties intended to opt out, or wrongly concluding that they did not. In light of the FAA's history, we believe that the former is worse than the latter.

Second, we strive to create a regime under which it will be easy for arbitrators

---

4. We acknowledge that there are decisions to the contrary, but we find them to be of little value. Many of the cases were decided before Mastrobuono clarified the meaning of *Volt*. *See Barbier v. Shearson Lehman Hutton, Inc.*, 948 F.2d 117 (2d Cir.1991); *Flexible Mfg. Sys. Ltd., v. Super Prod. Corp.*, 874 F.Supp. 247 (E.D.Wis.1994); *Flight Sys. v. Paul A. Laurence Co.*, 715 F.Supp. 1125 (D.D.C.1989); *Smith Barney, Harris Upham & Co., Inc. v. Luckie*, 85 N.Y.2d 193, 623 N.Y.S.2d 800, 647 N.E.2d 1308 (1995); *Thomson McKinnon Se-*

*cur., Inc. v. Cucchiella*, 32 Mass.App.Ct. 698, 594 N.E.2d 870 (1992). Other decisions, though decided after *Mastrobuono*, never so much as cite the decision and tend to focus on preemption rather than contract construction. *See ASW Allstate Painting & Constr. Co., Inc. v. Lexington Ins. Co.*, 188 F.3d 307 (5th Cir. 1999); *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391 (D.C.Cir.1995); *M & L Power Servs., Inc. v. American Networks Int'l*, 44 F.Supp.2d 134 (D.R.I.1999).

and district courts to deter mine whether parties have opted out of federal standards. Finally, we seek to create a rule that sophisticated parties may bargain around without significantly increasing their transaction costs.

In light of these guideposts, we believe that the best rule is that a generic choice-of-law clause, standing alone, raises no inference that contracting parties intended to opt out of the FAA's default regime. This rule will ensure that parties who have never thought about this particular issue—a characterization that, we suspect, would apply to the parties in this case—will not be found to have opted out. It will also make life easier for both arbitrators and judges because the analysis will be complete once they conclude that an agreement contains nothing more than a generic choice-of-law clause. In contrast, any other rule would often require a protracted analysis to determine whether the parties have contracted out of the default federal standards, a process that would impose two burdens: (1) it would make cases harder to decide for both arbitrators and judges; and (2) the resulting legal uncertainty might deter settlements.

Lastly, the rule we announce will preserve and facilitate the ability of parties to contract around the default federal standards. Sophisticated parties (i.e., those who employ experienced lawyers to draft their contracts) will soon learn that a generic choice-of-law clause is not enough. Assuming that both parties *genuinely* wish to be governed by standards other than the FAA's, requiring something more will impose minuscule transaction costs. It is not particularly difficult, for example, to

provide that "any controversy shall be settled by arbitration in accordance with the terms of the Pennsylvania Uniform Arbitration Act." *Cf. Ford v. NYLCare Health Plans of Gulf Coast, Inc.*, 141 F.3d 243, 246 (5th Cir.1998) (noting that the parties' contract provided that "[a]ny controversy ... shall be settled by arbitration in accordance with the Texas General Arbitration Act").[5] We note also that any other rule would impose transaction costs as well by impelling parties not wishing to opt out to include a provision saying that their choice-of-law clause should not be read to raise such an inference.

Our rule is also consistent with the case law. First, it honors *Mastrobuono's* directive that FAA standards apply "in the absence of contractual intent to the contrary." 514 U.S. at 59, 115 S.Ct. 1212. As we have explained, there is good reason to believe that contracts often contain both generic choice-of-law and arbitration clauses in cases where it is likely that the parties gave absolutely no thought to opting out of the FAA's default standards.

Second, the rule we announce today is in synch with *Mastrobuono's* holding. We acknowledge that that opinion concludes with a discussion that is premised on the assumption that the presence of a choice-of-law clause can render a contract ambiguous as to whether the parties intended to incorporate state arbitration rules into their agreement. *See id.* at 63–65, 115 S.Ct. 1212. The Court, however, was careful to make clear that it was rendering no holding as to the meaning of the clause itself. *See, e.g., id.* at 62, 115 S.Ct. 1212 ("*At most*, the choice-of-law clause introduces an ambiguity into an arbitration

**5.** We do not mean to suggest that parties may not be found to have opted out unless their contract includes a statement such as this one. We hold only that a generic choice-of-law clause, standing alone, raises no such inference. The case might well be different if other contractual language or other evidence suggested that the parties intended to be bound by standards borrowed from state law.

agreement that would otherwise allow punitive damages awards." (emphasis added)).[6] Third, our holding is in accord with decisions by six of our sister circuits that declined to construe a generic choice-of-law clause as raising an inference that the contracting parties intended to incorporate state law arbitration standards into their agreement.[7]

### B.

Judge Ambro proposes a different approach, arguing that contracts containing generic choice-of-law clauses and arbitration clauses should be construed as incorporating all state arbitration rules that are "procedural" in nature and "substantive" state arbitration rules that do not "conflict" with the FAA. *See Ambro Op.* at 304–05. We are unconvinced, believing that the reasons outlined above that counsel in favor of the rule we announce today. Additionally, we have three problems with Judge Ambro's proposal.

First, Judge Ambro's proposal is based on the false premise that we must find a way to "reconcile[ ]" *Volt* and *Mastrobuono*. *Id.* But as we explained, *supra* at Part III, the Supreme Court has already clarified the relationship between the two cases. In *Volt*, the Court followed its rule of deferring to state court interpretations of private contracts so long as no federal rights are at stake. The Court had no such obligation in *Mastrobuono* because that case (like this one) originated in federal court. *See Mastrobuono*, 514 U.S. at 60 n. 4, 115 S.Ct. 1212; *see also Volt*, 489 U.S. at 474–76, 109 S.Ct. 1248. Judge Ambro is apparently unconvinced by *Mastrobuono's* method of distinguishing *Volt*, *see Ambro Op.* at 303 & n. 2, but whether we find *Mastrobuono* persuasive or not is of no moment. It is not the province of this Court to craft a rule based on an assumption that the Supreme Court was wrong or that it could not have meant what it said. As we noted earlier, numerous cases have examined the interrelationship between *Volt* and *Mastrobuono*. *See*

---

**6.** It is for this reason that *Mastrobuono's* invocation of *contra proferentem* to justify its decision is not inconsistent with the rule we announce here. The party that drafted the contract at issue in that case contended that it incorporated a New York rule that precluded arbitrators from awarding punitive damages. Near the end of its opinion the Court stated that the drafter could not "over come the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it." *Id.* at 62, 115 S.Ct. 1212. But as we explained in the text, the *Mastrobuono* Court assumed *without deciding* that the agreement was ambiguous. Consequently, Judge Ambro is incorrect in arguing that, under *Mastrobuono*, "a generic choice-of-law provision not electing any specific law in the same agreement, is ambiguous." *Ambro Op.* at 306 (emphasis added). Under our holding today, a generic choice-of-law clause is insufficient as a matter of law to show that the contracting parties intended to displace the FAA's default rules. As a result, the contract

is not legally ambiguous, and *contra proferentem* is inapplicable.

**7.** *See PaineWebber, Inc. v. Elahi*, 87 F.3d 589, 592, 594 (1st Cir.1996); *National Union Fire Ins. Co. v. Belco Petroleum Corp.*, 88 F.3d 129, 132, 134–35 (2d Cir.1996); *Porter Hayden Co. v. Century Indemnity Co.*, 136 F.3d 380, 382 (4th Cir.1998); *Ferro Corp. v. Garrison Indus., Inc.*, 142 F.3d 926, 927–28, 937 (6th Cir. 1998); *UHC Management Co., Inc. v. Computer Sciences Corp.*, 148 F.3d 992, 994, 997 (8th Cir.1998); *Wolsey, Ltd. v. Foodmaker, Inc.*, 144 F.3d 1205, 1209, 1212–13 (9th Cir.1998). *But see ASW Allstate Painting & Constr. Co., Inc. v. Lexington Ins. Co.*, 188 F.3d 307, 310 (5th Cir.1999) (per curiam) (concluding otherwise); *Ekstrom v. Value Health, Inc.*, 68 F.3d 1391, 1394–96 (D.C.Cir.1995) (same). We are unpersuaded by *ASW* and *Ekstrom* for a simple reason: neither opinion gives any reasons for concluding that a generic choice-of-law clause should be read as evidencing an intent to opt out of the FAA's default regime.

*supra* pp. 295–96 & n. 5. We have not located, nor has Judge Ambro cited, a single case that "reconciled" the Court's two opinions on the basis proposed by Judge Ambro.

The second reason for our disagreement with Judge Ambro's proposal is that we believe that it would not effectively advance its stated purpose of effectuating the intent of most contracting parties. Judge Ambro concludes his concurrence by arguing that "custom and practice among contract drafters" counsel in favor of construing contracts such as this one as incorporating arbitration standards borrowed from state law. *Ambro Op.* at 308. But that would not happen even under Judge Ambro's approach; rather, Judge Ambro's approach would have courts construe contracts like this one as incorporating all state arbitration rules that are "procedural" in nature, but only those "substantive" rules that do not "conflict" with the FAA. Though reasonable people may quarrel over whether most parties to contracts such as the one before us would wish to be bound by the FAA's default standards or would instead choose to be bound by standards borrowed from state law, we think it most unlikely that any sizeable number of parties would wish to be bound by some federal standards and some state ones.

Lastly, we believe that Judge Ambro's proposal would unduly complicate the law in this area. Under Judge Ambro's approach, arbitrators and courts seeking to determine whether a given rule was supplied by the FAA or was instead borrowed from state law would first need to classify the relevant rule as being either "substantive" or "procedural" for purposes of the FAA.[8] It is possible that arbitrators and courts would simply import the distinctions that have been drawn in the diversity context pursuant to *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), but the jurisprudence in that area is not always a model of clarity, and, at all events, we do not understand why distinctions drawn in a totally different context would necessarily transfer well to the FAA.

The problematic nature of Judge Ambro's proposal would only increase in any case where the party seeking vacatur complained about multiple issues, at least one of which was "procedural" and at least one of which "substantive" (however those terms are defined). In such a case, a reviewing court could be required to apply some rules borrowed from state law (i.e., "procedural" rules and the relevant state's "substantive" rules that do not conflict with the FAA) and some rules taken from the FAA (i.e., "substantive" rules where the rule from the relevant state is in "conflict" with the FAA). Issues involving vacatur are difficult enough without the additional challenge of balancing and applying multiple legal regimes within the same case. For all of these reasons, we decline to adopt Judge Ambro's proposal.

**8.** Although Judge Ambro cites two Pennsylvania cases for the proposition that standards of review are procedural, we think that this would have to be a question of federal law. Judge Ambro's view is that a generic choice-of-law clause incorporates all of the chosen state's arbitration law except those portions whose incorporation would be inconsistent with federal law, i.e., substantive rules that "conflict" with the FAA. As a consequence, under the regime proposed by Judge Ambro, the categorization of a given rule as "substantive" or "procedural" would in large part determine whether it was preempted by the FAA. In our view, because the scope of the preemptive effect of a federal statute is itself a question of federal law, the question whether a given rule was "substantive" or "procedural" for purposes of the FAA would likewise be a question of federal law.

## C.

Applying our rule to the facts of this case yields an simple answer. The LCOA contains only a generic choice-of-law clause and there is no extrinsic evidence of an intent to contract out of the FAA's default regime. We therefore hold that the District Court was correct in concluding that the FAA standards of review govern this case.

## V.

■❚ Applying the FAA standards, we agree with the District Court that the arbitrator exceeded the scope of his authority. Though judicial review under the FAA is "narrowly circumscribed," *Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc.*, 773 F.2d 530, 533 (3d Cir.1985), the scope of an arbitrator's authority is defined and confined by the agreement to arbitrate, *see, e.g., Swift Indus., Inc. v. Botany Indus., Inc.*, 466 F.2d 1125, 1131 (3d Cir.1972). Accordingly, the FAA provides that a court "may make an order vacating [an] award ... [w]here the arbitrators exceeded their powers." 9 U.S.C. § 10(a)(4).

It is undisputed that the only issue presented to the arbitrator was whether RPS's "termination of [Kayser] was within the terms of [the LCOA]." The District Court found that the arbitrator exceeded his powers, and it is manifest that the court's conclusion was based on the text of the arbitrator's written decision, the relevant portions of which are set out in pages 290 of this opinion. The court noted that the arbitrator had "fram[ed] the issue as one of wrongful or proper termination" and then "proceed[ed] to discuss the inadequacy of RPS' procedure for warning independent contractors of performance deficiencies and finally conclude[d] that 'the RPS system[is] lacking in due process toward the Claimant contractor.'" *Dist. Ct.*

*Op.* at 14 (quoting *Arb. Op.*). The court stressed that "[t]he arbitration provision clearly limits the arbitrator's authority to decide only whether the termination was within the terms of the Agreement, not to examine the fairness of the extrinsic procedures by which RPS notifies contractors of problems." *Id.* It concluded that "[b]y grounding his decision on such considerations of fairness and thereby altering the Agreement to require certain pre-termination procedures, the arbitrator overstepped the bounds of the authority granted to him by the Agreement." *Id.* at 14–15. On appeal, RPS essentially adopts the District Court's analysis.

Kayser advances three arguments in response. He rightly notes that Mechmann was not required to justify or rationalize his decision. *See Local 863*, 773 F.2d at 534. He also correctly observes that the arbitrator was entitled to make suggestions that went beyond the scope of his authority to decide. See *Apex Fountain Sales, Inc. v. Kleinfeld*, 818 F.2d 1089, 1095 (3d Cir.1987). Finally, though acknowledging that the arbitrator made "reference to due process issues," Kayser stresses the eighth paragraph of Mechmann's decision, which states: "I conclude that this was a wrongful termination by RPS of the LCOA." Kayser argues that Mechmann did not, "in the final analysis, tie his reference to the due process issues into his decision." Instead, Kayser claims, "the reference to due process [was] simply surplus, [was] irrelevant to Mr. Mechmann's decision and should not have been used as a basis by the court to suggest that the Arbitrator went beyond his authority." *Appellant's Br.* at 14–15.

Before parsing the arbitrator's opinion to determine whether he exceeded his authority, we must first confront the question whether it is proper to do so. Kayser does not argue that courts are barred from

examining an arbitrator's statement of reasons, and, at all events, such a contention would be contrary to our cases. *See United States Steel & Carnegie Pension Fund v. McSkimming,* 759 F.2d 269, 271 (3d Cir.1985) (vacating an arbitrator's award that ordered the payment of pension benefits where an examination of the arbitrator's written decision convinced the Court that "the arbitrator's award [was] patently based on statutory interpretation rather than the Plan"); *see also Pennsylvania Power Co. v. Local Union # 272 of the Int'l Bhd. of Elec. Workers,* 886 F.2d 46, 49 (3d Cir.1989) (concluding that a particular dispute was not arbitrable and remarking that "[n]othing in the arbitrator's two rulings convinces us to the contrary" because the opinions revealed that the arbitrator had based his decision "on the general desirability of arbitration" rather than the language of the agreement).

On the other hand, we have also cautioned against exploiting "an ambiguity" in an arbitrator's decision to support "an inference" that he or she exceeded his or her authority. *NF&M Corp. v. United Steelworkers of Am.,* 524 F.2d 756, 759 (3d Cir.1975). The reason for this policy is that "[t]o require opinions free of ambiguity [could] lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable, for a well-reasoned opinion tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement." *United Steelworkers of Am. v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 598, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960).

We distill the following principles from our precedents: (1) a reviewing court should presume that an arbitrator acted within the scope of his or her authority; (2) this presumption may not be rebutted by an ambiguity in a written opinion; but (3) a court may conclude that an arbitrator

exceeded his or her authority when it is obvious from the written opinion.

Under these standards, we hold that the District Court was correct in concluding that Mechmann exceeded his authority. Although Mechmann's opinion begins by acknowledging that his authority is set forth in Section 9.3(e) of the LCOA, it contains only four paragraphs of substantive discussion—*all* of which focus on the way in which RPS communicated to Kayser that it was dissatisfied with his performance. *See supra* page 290. The conclusion that arbitrator Mechmann derived from this discussion was not that Kayser's termination had been contrary to the LCOA (the question actually before him), but rather that "the RPS system [was] lacking in due process toward [Kayser]." Kayser would have us believe that the arbitrator devoted four paragraphs to "mere dicta," but not one sentence to explaining his supposed "holding" that the termination violated the terms of the agreement. That reading is simply not supported by the arbitrator's opinion, which demonstrates, beyond peradventure, that Mechmann ruled on an issue that was not properly before him.

Moreover, as noted by RPS, the arbitrator never framed or decided the issue in the terms stated by the LCOA: "[W]hether the termination of [Kayser] was within the terms of this Agreement." Instead, Mechmann stated that "[t]he main question" was whether "the termination" was "wrongful or proper." And Mechmann's "conclu[sion]" was "that this was wrongful termination by RPS of the LCOA," not that the termination violated "the terms of" the LCOA. Though these latter two references, standing alone, would not suffice to show that the arbitrator exceeded his authority, they lend further support to our conclusion that he did so. We hold that the District Court was correct to va-

cate the arbitrator's award, and will therefore affirm its order.[9]

AMBRO, Circuit Judge, Concurring:

I concur in the outcome reached by my colleagues. I agree that the arbitrator in this case exceeded his authority in making the award in favor of Mr. Kayser against Roadway Package System, Inc. ("RPS"). In arriving at this result, I agree that the Federal Arbitration Act (the "FAA"), 9 U.S.C. § 1 *et seq.*, permits parties by private agreement to contract around the FAA's standards by which arbitrators' awards are vacated. I also agree that whether the parties have contracted out of the FAA's vacatur of awards standard is a

matter of contract construction.[1] But I disagree with my colleagues' conclusion that, as a matter of contract construction, the parties' choice of Pennsylvania law to govern the Linehaul Contractor Operating Agreement (the "LCOA") requires that the FAA, and not Pennsylvania law, provide the standard of judicial review to be applied to that contract's arbitration provision (which makes no mention of a governing law). In determining that the FAA requires that the LCOA contain a "clear intent" to have Pennsylvania law govern its arbitration provision, or else by default the FAA applies, my colleagues, I believe, misapply our Supreme Court's decision in *Mastrobuono v. Shearson Lehman Hut-*

---

9. Our affirmance of the District Court's vacatur order gives rise to a controversy as to whether Kayser may seek rearbitration. The FAA provides that "[w]here an award is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a rehearing by the arbitrators." 9 U.S.C. § 10(a). As our previous discussion indicates, the arbitrator's opinion is unclear as to whether he ruled on the issue that was before him: whether RPS's termination of Kayser's contract was within the terms of LCOA. Under these circumstances, rehearing would *seem appropriate.* But *query whether* "the time within which the agreement required the award to be made has ... expired." Though the LCOA itself sets no particular date by which an award must be entered, the parties agreed to "arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association [(AAA or Association)]." LCOA § 9.3. The question seems to be, therefore, whether AAA rules impose an outer time limit, and that may well be a matter better resolved by the Association. We do not decide these difficult issues, which are not before us, but leave them for any further proceedings that may occur.

If a rearbitration occurs in this matter, we note for guidance that all members of the panel are in agreement that, at all events, the arbitrator's award should have been reduced to no more than $129,930.00—the amount Kayser originally sought to compensate him

for his "lost profits." According to Section 9.3(e) of the LCOA, Kayser was entitled to damages only for his "net earnings ... during the period between the date of termination to the last day of the term of this Agreement." As noted in the text, Kayser originally sought $141,961.40 ($129,930.00 in lost profits and $12,031.40 for purchasing a truck at the behest of RPS), but the arbitrator awarded him $174,431.15. We are satisfied that the truck purchase was plainly outside the scope of allowable damages and can find no support in the record for the arbitrator's award of $32,469.75 *more* than Kayser originally requested. That being said, the panel expresses no opinion as to whether an award of $129,930.00 was justified in this case.

1. My colleagues use "contract construction" instead of "contract interpretation," and I presume they do so deliberately. Under contract construction a court construes the effect of an agreement under applicable law. Contract interpretation is the attempt by a court to ascertain the intent of the parties to an agreement by the words they use to express that agreement. The former is a matter of law, the latter one of fact. *See John F. Harkins Co., Inc. v. Waldinger Corp.*, 796 F.2d 657, 659–60 (3d Cir.1986); *Ram Const. Co. v. Am. States Ins. Co.*, 749 F.2d 1049, 1052–53 (3d Cir.1984); *see generally* Edwin W. Patterson, *The Interpretation and Construction of Contracts*, 64 Colum. L.Rev. 833, 835 (1964); 3 Corbin on Contracts § 534, at 9 (1960).

*ton, Inc.,* 514 U.S. 52, 115 S.Ct. 1212, 131 L.Ed.2d 76 (1995), and disregard custom and practice among the drafters of agreements.

## A. The FAA

The issue of the FAA's preemption of state arbitration law is a subject of considerable debate. *See, e.g., id.* at 52, 56, 115 S.Ct. 1212; *Volt Info. Scis., Inc. v. Bd. of Trustees of Leland Stanford Junior Univ.,* 489 U.S. 468, 472, 109 S.Ct. 1248, 103 L.Ed.2d 488 (1989); Maj. Op. at 296 n. 4. Interestingly, the FAA was enacted in 1925 for the purpose of "overcom[ing] courts' refusals to enforce agreements to arbitrate." *Allied—Bruce Terminix Cos. v. Dobson,* 513 U.S. 265, 270, 115 S.Ct. 834, 130 L.Ed.2d 753 (1995). But this obvious pro-arbitration policy does not operate without regard to the intent of the parties to an agreement to arbitrate. Parties may choose that their arbitration be governed by rules other than those supplied by the FAA, *Volt,* 489 U.S. at 479, 109 S.Ct. 1248, and the FAA "simply requires courts to enforce [those] privately negotiated agreements ... in accordance with their terms." *Id.* at 478, 109 S.Ct. 1248.

## B. Supreme Court Jurisprudence—*Volt* and *Mastrobuono*

Our Supreme Court has twice within the last twelve years dealt with the deceptively difficult issue of whether the FAA impliedly governs an agreement to arbitrate within a contract specifically chosen by the parties to be governed by state law. *See Mastrobuono,* 514 U.S. at 52, 115 S.Ct. 1212; *Volt,* 489 U.S. at 468, 109 S.Ct. 1248. In *Volt,* the Supreme Court held that the FAA did not preempt a contract's super-

generic[2] choice of "the law of the place where the Project is located" (in that case, California). Ruling that "where the parties have agreed that their arbitration agreement will be governed by the law of California," a California court, pursuant to its state arbitration law, could stay the arbitration pending the results of related litigation involving third parties, something the FAA does not contemplate and thus would not permit if it governed. *Volt,* 489 U.S. at 470, 109 S.Ct. 1248. "Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward." *Id.* at 479, 109 S.Ct. 1248. That is because "[a]rbitration under the[FAA] is a matter of consent, not coercion." *Id.* Understood this way, where parties have a generic choice-of-law provision governing their contract, they must affirmatively choose to have their agreement to arbitrate governed by the FAA. The only exception would be if the state rule chosen "would undermine the goals and policies of the FAA." *Id.* at 478, 109 S.Ct. 1248.

*Mastrobuono,* decided only six years after *Volt,* held, in the context of a form contract containing a generic New York choice-of-law provision and a separate arbitration provision, that the FAA (which permitted punitive damages awards by arbitrators) preempted New York law (which did not). The Supreme Court determined that New York law would govern substantive principles of the agreement but could not provide, by the use of generic choice-of-law language alone, "special rules limit-

---

**2.** My colleagues refer to a generic choice of law as an agreement that states that it will be governed by the laws of a particular jurisdiction (in this case, Pennsylvania). In *Volt,* no particular jurisdiction was listed in the agreement under review. Thus, if our case involves a generic choice of law, *Volt* pertains to a super-generic choice of law.

ing the authority of the arbitrator." *Mastrobuono*, 514 U.S. at 64, 115 S.Ct. 1212. *Mastrobuono* did not purport to reverse or even limit *Volt*. Instead, the Court distinguished *Volt* in a footnote:

> In *Volt* ... we deferred to the California court's construction of its own state's law.... In the present case, by contrast, we review a federal court's interpretation of this contract, and our interpretation accords with that of the only decision-maker arguably entitled to deference—the arbitrator.[3]

*Id.* at 60 n. 4, 115 S.Ct. 1212.

Underlying the Court's decision in *Mastrobuono* is that "the wishes of the contracting parties" prevail, *id.* at 57, 115 S.Ct. 1212 (citing *Volt*, 489 U.S. at 468, 109 S.Ct. 1248), even if those wishes contravene the FAA by "an unequivocal exclusion of punitive damages claims." *Id.* at 60, 115 S.Ct. 1212. In ascertaining those wishes, *Mastrobuono* instructs a court to take into account three principles of contract construction and interpretation. The first (which is in line with *Volt*, 489 U.S. at 478, 109 S.Ct. 1248) is that the application of the law chosen would not under mine

(absent express agreement) the goals and policies of the FAA. *Id.* at 56, 115 S.Ct. 1212 ("New York's prohibition against arbitral awards of punitive damages ... is a vestige of the 'ancient' judicial hostility to arbitration."). The second principle is that, by placing in its contract a generic choice of law and an arbitration provision without a specific choice of law, Shearson Lehman "drafted an ambiguous contract, and ... cannot now claim the benefit of the doubt." *Id.* at 63, 115 S.Ct. 1212. Finally, "a document should be read to give effect to all its provisions and to render them consistent with each other." *Id.* Each of these principles is discussed below in the context of this case.

The difference between *Volt* and *Mastrobuono*, "while there, is difficult to grasp." *Lanier v. Old Republic Ins. Co.*, 936 F.Supp. 839, 844 (M.D.Ala.1996). But these cases can, I believe, be reconciled. Taken together, they require that a substantive state arbitration rule (such as New York's barring of arbitrators awarding punitive damages) is superseded by the FAA where there is a conflict between the FAA and the state rule, though even that

---

**3.** Ironically, the Supreme Court pointed out in *Mastrobuono* that it would decide the case "the same under either a de novo or a deferential standard." *Mastrobuono*, 514 U.S. at 55 n. 1, 115 S.Ct. 1212. Moreover, *Mastrobuono's* effort to distinguish *Volt* has received strong criticism. *See* Thomas A. Diamond, *Choice of Law Clauses and Their Preemptive Effect on the Federal Arbitration Act: Reconciling the Supreme Court with Itself*, 39 Ariz. L.Rev. 35, 56–58 (1997) ("This would suggest that *Mastrobuono* is applicable only when the choice of law clause's intended meaning is resolved in federal court. State courts would remain free to ignore *Mastrobuono* while federal courts would be obligated to honor it. When the Supreme Court held in *Southland Corp. v. Keating* [465 U.S. 1, 104 S.Ct. 852, 79 L.Ed.2d 1 (1984)] that the provisions of the FAA must be honored by state courts as well as federal courts, it did so to assure uniformity of law irrespective of the selected forum.

To hold otherwise would 'encourage and reward forum shopping.... Furthermore, the Court's premise that a state court's interpretation of a choice of law clause is entitled to deference while a federal court's interpretation is subject to de novo review is insupportable.") (citations omitted); *see also* Heather J. Haase, Note, *In Defense of Parties' Rights to Limit Arbitral Awards Under the Federal Arbitration Act: Mastrobuono v. Shearson Lehman Hutton, Inc.*, 31 Wake Forest L.Rev. 309, 331–32 (1996) ("Although purporting to follow *Volt*, the Supreme Court has ignored its own mandate in *Volt* to enforce 'contractual rights and expectations of the parties,' and has instead distorted the meaning of the federal policy in order to reach the conclusion that punitive damages should be allowed in arbitration.") (citations omitted); Joshua M. Barrett, Note, *Federal Arbitration Policy After Mastrobuono v. Shearson Lehman Hutton, Inc.*, 32 Willamette L.Rev. 517, 534 (1996).

conflict can be overcome if dealt with explicitly in the contract. On the other hand, the FAA defers to procedural state arbitration rules (such as the California rule delaying an arbitration pending resolution of another matter in litigation), even when the FAA is in conflict. *See Mastrobuono*, 514 U.S. at 63–64, 115 S.Ct. 1212 ("We think that the best way to harmonize the choice-of-law provision with the arbitration provision is to read 'the laws of the State of New York' [in the choice-of-law provision] to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators."); *Volt*, 489 U.S. at 479, 109 S.Ct. 1248 ("Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward."); Thomas A. Diamond, *Choice of Law Clauses and Their Preemptive Effect on the Federal Arbitration Act: Reconciling the Supreme Court with Itself,* 39 Ariz. L.Rev. 35, 60–65 (1997) (hereinafter "Diamond").

### C. Our Case

Applied to our case, the issue is this: in a contract containing an arbitration provision making no mention of the FAA, is the affirmative choice of Pennsylvania law in a general choice-of-law clause enough to govern that entire contract, or does the FAA further require that the arbitration section of that contract explicitly choose Pennsylvania law again for its (and not the FAA's) arbitration procedures to apply? More specifically, the conflict is whether the FAA or the Pennsylvania Uniform Arbi-

tration Act (the "PUAA") [4] governs the parties' arbitration. This issue is easily resolved in favor of the PUAA if only *Volt* applies. But *Mastrobuono* creates the complexity. Consequently, I analyze our issue based on my reading of the principles of *Volt* and *Mastrobuono*.

1. Application of the Principles of *Volt* and *Mastrobuono*

   a. Law Chosen to Govern LCOA (Pennsylvania) Does Not Undermine FAA

In applying *Volt* and *Mastrobuono* to our case, the initial question is whether the application of Pennsylvania law to the arbitration section of the LCOA undermines the FAA. This requires, in my view, preliminary consideration of whether vacating an arbitrator's award because the arbitrator exceeded his authority is procedural or substantive. If the former, the generic choice of Pennsylvania law to govern the LCOA means that the PUAA governs all aspects of arbitration. If substantive, we then must address whether the PUAA is in conflict with the FAA, for only then does the FAA preempt in our case.

I believe that vacating an arbitrator's award because the arbitrator exceeded his authority is procedural, *see Hade v. Nationwide Ins. Co.*, 349 Pa.Super. 541, 503 A.2d 980, 982 (1986), *overruled on other grounds by Ostroff v. Keystone Ins. Co.*, 357 Pa.Super. 109, 515 A.2d 584 (1986) (" 'Irregularity' refers not to the award itself, but to the process used in arriving at this award."); Diamond, 39 Ariz. L.Rev. at 62 & n. 223, and thus the FAA defers to the generic choice of state law to govern such matters. But even if the vacatur of arbitrators' awards is substantive, Penn-

---

**4.** Under the PUAA, three types of arbitration are provided: (1) statutory, 42 Pa. Cons.Stat. §§ 7301–7320; (2) common law, 42 Pa. Cons. Stat. §§ 7341–7342; and (3) judicial, 42 Pa.

Cons.Stat. §§ 7361–7362. My colleagues and I agree that common law arbitration would be applicable if Pennsylvania law were to apply. *See* Maj. Op. at 291–92 n. 2.

sylvania law is not in conflict with the FAA, for both the FAA and common law arbitration under the PUAA permit vacating or modifying arbitral awards in circumstances where the arbitrator exceeds his or her authority. *Compare* 9 U.S.C. § 10(a)(1) (allowing courts to vacate arbitrators' awards where "procured by corruption, fraud, or undue means"), *and id.* § 10(a)(4) (allowing vacatur where the arbitrator "exceeded [his or her] powers"), *with* 42 Pa. Cons.Stat. § 7341 (authorizing vacatur where "fraud, misconduct, corruption or *other irregularity* caused . . . an unjust [or] inequitable . . . award") (emphasis added). An "irregularity" under Pennsylvania common law arbitration can include that the arbitrator considered issues beyond the scope of the arbitration clause. *See Hade,* 503 A.2d at 983 ("Admittedly, a finding that the panel considered an issue beyond the scope of the arbitration clause would support a modification of the award on appeal."). Thus, unlike my colleagues, I do not believe that judicial power under Pennsylvania common law arbitration to vacate awards is "so much narrower than the FAA's" vacatur standards. Maj. Op. at 291–92 n. 2. In any event, any differences that may exist do not determine the outcome of this case, and thus the PUAA does not undermine the goals and policies of the FAA in this instance.

### b. LCOA Is Ambiguous and Must be Construed Against its Drafter (RPS)

Following the further teaching of *Mastrobuono,* a generic choice-of-law provision,

coupled with an arbitration provision not electing any specific law in the same agreement, is ambiguous.[5] *Mastrobuono,* 514 U.S. at 62–63, 115 S.Ct. 1212. Under the rule of *contra proferentum,* drafters (such as Shearson Lehman in *Mastrobuono*) "cannot now claim the benefit of the doubt" with respect to that ambiguity. *Id.* at 63, 115 S.Ct. 1212. RPS is in the same boat rowing with the same oars. It alone drafted the LCOA and in it chose Pennsylvania law without mentioning the FAA in the arbitration section of that contract. It cannot now argue that what *Mastrobuono* found to be ambiguous should be interpreted in RPS's favor by applying the FAA to the vacatur of the arbitrator's award.

My colleagues find, in disregard of *Mastrobuono* (and, I believe, counterintuitively), that the choice of Pennsylvania law in the LCOA, coupled with a general arbitration provision that does not select a set of state arbitration rules, is by default a "not legally ambiguous" choice of the FAA to govern the arbitration section. Maj. Op. at 298 n. 6. But even their own words belie this conclusion.

Because the presence of a generic choice-of-law clause tells us little (if anything) about whether contracting parties intended to opt out of the FAA's default standards and incorporate one borrowed from state law, we need to establish a default rule, and the one we adopt is that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intend-

---

5. My colleagues conclude that *Mastrobuono* merely contains "a discussion that is premised on the assumption that the presence of a choice-of-law clause can render a contract ambiguous as to whether the parties intended to incorporate state arbitration rules into their agreement." Maj. Op. at 298; *see also* Maj. Op. at 298 n. 6 ("[A]s we explained, the

*Mastrobuono* Court assumed *without deciding* that the agreement was ambiguous."). What they ignore is the following Shermanesque statement of *Mastrobuono:* "Respondents [Shearson Lehman, et al.] drafted an ambiguous document, and they cannot now claim the benefit of the doubt." *Mastrobuono,* 514 U.S. at 63, 115 S.Ct. 1212.

ed to opt out of the FAA's default standards.

Maj. Op. at 296. If a generic choice-of-law clause in an agreement "tells us little if anything" about whether the parties opted out of the FAA, then the plain words of the agreement are unclear. Where something is unclear or incapable of one possible meaning, it is *ipso facto* ambiguous. *Websters' Third New International Dictionary of the English Language Unabridged* 66 (1971); *accord Sumitomo Mach. Corp. of Am. v. AlliedSignal, Inc.*, 81 F.3d 328, 332 (3d Cir.1996) (an agreement is ambiguous if it is "susceptible of more than one meaning"). To argue that unclear is, by default, "not legally ambiguous," Maj. Op. at 298 n. 6, is, at best, interestingly ironic.

My colleagues' attempt to answer this irony is that "a generic choice-of-law clause is insufficient as a matter of law to show that the contracting parties intended to displace the FAA's default rules.[6] As a result, the contract is not legally ambiguous, and *contra proferentum* is inapplicable." *Id.*

I do not understand this statement. *Mastrobuono* nowhere states that a generic choice of law is insufficient as a matter of law to show that the parties intended to displace the FAA. The Supreme Court's position is more subtle. When an agreement involving interstate commerce is affected, the FAA applies to enforce arbitration. If the agreement containing an arbitration provision has no choice of law, the FAA by default supplies the rules of arbitration. By contrast, if the agreement contains an arbitration section with no choice of law but a generic choice of state law for the entire agreement, that state law choice supplies (a) the procedural rules for arbitration even if the FAA is in conflict (the teaching of *Volt*) and (b) the substantive rules for the arbitration unless the FAA is in conflict and the agreement does not explicitly choose the conflicting substantive rule (the teaching of *Mastrobuono*).[7]

Thus, I do not agree with my colleagues that my approach "unduly complicate[s] the law in this area." Maj. Op. at 299. Rather, it comports with the Supreme Court's rulings in *Volt* and *Mastrobuono*.

c. Reading LCOA's Choice-of-Law and Arbitration Sections as Consistent

Finally, *Mastrobuono* counsels "that a document should be read to give effect to all its provisions and to render them consistent with each other." *Mastrobuono*, 514 U.S. at 63, 115 S.Ct. 1212. It is hardly internally inconsistent to determine that the choice of Pennsylvania law to govern the LCOA also governs its section on arbi-

---

**6.** My colleagues never state what the FAA's default rules are. Instead, they posit by ukase what they determine to be the default rule for a generic choice of law in an agreement containing an arbitration provision not electing its own internal choice of law. Their default rule is that, absent a "clear intent" to choose state law to govern an agreement's arbitration provision, the FAA applies. Maj. Op. at 288, 293–94.

This default rule brings into focus where my colleagues and I part. They read the FAA, presumably by some preemptive principle (though they deny that this is a case of preemption, Maj. Op. at 294), as requiring "clear

intent" to displace it. But, as I note in this concurring opinion, I believe that *Mastrobuono* takes a more nuanced approach.

**7.** My colleagues write that any attempt to reconcile *Volt* and *Mastrobuono* is a "false premise," Maj. Op. at 298, and that I "craft a rule based on the assumption that the Supreme Court was wrong." *Id.* To the contrary, I believe that the Supreme Court itself supplies the reconciliation between these two cases. I would suggest, however, that in light of the Circuit split on this issue, *see* Maj. Op. at 298 n. 7, the Supreme Court may wish to clarify its holding in *Mastrobuono*.

tration when that choice implicates a rule (which I believe is procedural and in no event inconsistent with the FAA) relating to the standard for reviewing an arbitrator's award.

2.  Custom and Practice Among Drafters of Agreements Support the Determination that Pennsylvania Law Governs the LCOA

Custom and practice among the drafters of agreements support my belief that the choice of Pennsylvania law in the LCOA governs the entire contract (including its arbitration provisions). In practice, choice-of-law provisions are often highly contested. They are almost always negotiated in only one provision of the agreement and usually at (as in the LCOA) or near the end of that agreement. The choice of law almost invariably is meant to encompass the entire agreement. Usually no thought is given to having a bifurcated choice of law, but if it is, the bifurcated choice of law is set forth in the choice-of-law provision itself.

If RPS had intended that the FAA apply to the arbitration section of the LCOA, it would have so stated. Moreover, to require within the arbitration section of the LCOA the redundant choice of Pennsylvania law leads logically to the conclusion that other provisions of the LCOA may also need to contain that redundant choice, *e.g.*, provisions treating indemnification rights or termination events in contracts involving the interstate transportation of products. Thus, absent express preemption by the FAA,[8] I believe that Pennsylvania law governs the LCOA's arbitration section.

\*   \*   \*   \*   \*   \*

Where does this leave us? We all agree that the intentions of contracting parties prevail over the FAA. I believe that the generic choice of state law to govern a contract also governs the arbitration provision within that contract when arbitration procedure is affected. The FAA preempts when substantive law is affected and the state law chosen conflicts with the FAA absent explicit agreement to override that preemption. The standard to be applied when vacating or modifying an arbitrator's award is, I submit, a procedural matter. Notwithstanding, the Pennsylvania law for vacating arbitrators' awards does not conflict with the FAA. Therefore the PUAA should apply to the LCOA's arbitration provision. This result comports with *Volt* and *Mastrobuono*. Moreover, under *Mastrobuono* the contractual provisions here are ambiguous and must be construed against RPS, the drafter of the LCOA that chose only Pennsylvania law to govern it and now argues for the FAA as governing arbitration. Following this approach leaves the LCOA consistent internally.

One thing is certain to me. No default rule is called for by which an unclear intent (as my colleagues find) becomes transmogrified as legally unambiguous. In any event, when all analysis is done, the result is the same whether under Pennsylvania law or the FAA—the arbitrator's award is vacated. Thus, I concur with the Court's judgment but not, in part, my colleagues' reasoning.

---

**8.** There is none. *Volt,* 489 U.S. at 469, 109 S.Ct. 1248 ("The FAA contains no express preemptive provision.").