**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

No. 01-11008

STEVEN M. KLUMPE,

Plaintiff - Appellant,

versus

IBP, Inc.,

Defendant - Appellee.

Appeal from the United States District Court
For the Northern District of Texas

October 4, 2002

Before KING, Chief Judge, PARKER, Circuit Judge, and ELLISON,[*]
District Judge.

ROBERT M. PARKER, Circuit Judge:

Plaintiff-Appellant Steven M. Klumpe brought a wrongful
discharge suit against his former employer IBP, Inc., claiming
that he was terminated solely for his refusal to commit an
illegal act.  A jury agreed and awarded compensatory and punitive
damages.  The district court subsequently entered a take-nothing
judgment, however, concluding there was no evidence that Klumpe's
conduct would have been illegal.  We affirm.

---

[*] District Judge of the Southern District of Texas, sitting by
designation.

BACKGROUND

This matter arises from an on-the-job accident at IBP's Amarillo, Texas slaughterhouse. Chris Escamilla, an employee there, operated a hock cutter at the plant.[2] On April 5, 1997, the cutter severed three-and-a-half fingers from his right hand. Escamilla is Klumpe's step son,[3] and Klumpe also worked at IBP's Amarillo plant. At the time of the accident, Klumpe had been working at IBP for about 15 years--ever since he had graduated from high school--and was in the position of superintendent trainee. Klumpe attended to Escamilla following the accident but was not his supervisor.

IBP does not participate in Texas's statutory workers' compensation scheme, but instead has its own plan--the "Workplace Injury Settlement Program-Texas" ("WISP"). IBP conducts an orientation for new employees regarding the benefits of WISP. During the orientation, an IBP supervisor reads to employees from a prepared script. Employees are also given a written summary of the plan, called the "summary plan description" or "SPD." The script states that the SPD contains "just about everything you need to know about your Program, including your rights and responsibilities." To receive benefits under WISP, workers must

---

[2] Hock cutters (or "declaw cutters") are "hydraulic scissors" used to sever the hoofs from a cow.

[3] Escamilla is Klumpe's legally adopted son, but since both parties refer to Escamilla as Klumpe's step son, we will too.

sign an "Acceptance and Waiver." According to the script, the waiver "is an agreement between you and IBP that your claim will be settled by your participation in the Program and that you will not sue IBP in civil Court."

Shortly after the accident, Klumpe was several times asked to secure a waiver from Escamilla. Each time he refused. On April 15, 1997, Escamilla sued IBP in state court. Sometime later IBP's lawyer Ken Muncy received a subpoena ordering Klumpe to appear Monday, June 30, 1997, for deposition testimony related to Escamilla's suit. The subpoena also ordered Klumpe to produce "any and all documents which show the crewing guidelines for the hock cutter at the time of the incident in question."[4] Klumpe brought the subpoena to the attention of his supervisor, Kurt Suther, who told Klumpe not to turnover the documents but said that he would speak with Muncy about the matter. On the Friday before the deposition, Suther and Klumpe met with Muncy via teleconference. Muncy told Klumpe to "bring whatever documents he had in his possession that he thought were responsive to" the subpoena. No further instructions were given regarding the documents. On Sunday, Klumpe gave his own attorney, Jeff Blackburn, the crewing guidelines for the entire plant, which included specifications for about 170 jobs. Blackburn copied

_____

[4] Crewing guidelines describe how IBP's operations are staffed. At trial, counsel for IBP stated that "hundreds of thousands of dollars" are spent developing the guidelines, and for that reason IBP does not disclose them.

Escamilla's attorney and Muncy with the documents the same day. Klumpe was fired the following Monday, allegedly for removing confidential documents from the plant. No other reason was given for Klumpe's termination. About a year later Escamilla's suit was settled for $1.9 million.

Klumpe brought a wrongful discharge action against IBP, claiming that the sole reason for his termination was his refusal to secure Escamilla's waiver. Klumpe argues that to seek Escamilla's waiver would have been an illegal act because the SPD and orientation script misrepresent the benefits provided under WISP. The jury agreed and awarded Klumpe $802,000 in compensatory damages and $10 million in punitive damages. The district court subsequently invited IBP to file a motion for judgment as a matter of law, which it did, and after briefing, the court rendered a take-nothing judgment. Klumpe made a timely appeal.

## DISCUSSION

In diversity cases,[5] we apply state substantive law together with the federal rules of procedure. *See Ellis v. Weasler Eng'g, Inc.*, 258 F.3d 326, *amended on other grounds by* 274 F.3d 881 (5th Cir. 2001). The district court's entry of judgment as a matter of law is review de novo. *See Flowers v. S. Reg'l Physician*

---

[5] IBP is a South Dakota corporation with its principal place of business there.

*Servs.*, 247 F.3d 229, 235 (5th Cir. 2001). "If during a trial by jury a party has been fully heard on an issue and there is no legally sufficient evidentiary basis for a reasonable jury to find for that party on that issue, the court may determine the issue against that party and may grant a motion for judgment as a matter of law . . . ." FED. R. CIV. P. 50(a)(1). In evaluating the sufficiency of the evidence, we must draw all reasonable inferences and resolve all credibility issues in favor of the nonmoving party. *See Flowers*, 247 F.3d at 235. When the jury has found for the nonmovant on the disputed issue, we will not overturn the verdict "unless the facts and inferences point 'so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion.'" *Id.* (quoting *Omitech Int'l v. Clorox Co.*, 11 F.3d 1316, 1322 (5th Cir. 1994)).

Texas adheres to the rule of at-will employment, under which employment for an indefinite term may be terminated at will and without cause. *See Schroeder v. Texas Iron Works, Inc.*, 813 S.W.2d 483, 489 (Tex. 1991). An exception to this rule is the doctrine announced in *Sabine Pilot Service, Inc. v. Hauck*, 687 S.W.2d 733 (Tex. 1985), where the Texas supreme court gave an at-will employee the right to sue for wrongful discharge when he was fired solely for refusing to commit an unlawful act carrying criminal penalties, *id.* at 735. In a *Sabine Pilot* claim, whether the employee's conduct would have constituted an illegal act

requires an examination of the provision that allegedly prohibits the conduct.  The trial court must determine as a matter of law whether the provision makes its violation a criminal offense. *See id.* at 736 (Kilgarlin, J., concurring).  After that, the jury decides whether the employee's conduct would have been "an illegal act."  TEXAS PATTERN JURY CHARGES--BUSINESS, CONSUMER & EMPLOYMENT PJC 107.3 (2000 ed.).  To make this finding, the jury is instructed on what constitutes an offense of the provision at issue.  *See id.*  The plaintiff-employee is responsible for convincing the jury that he was fired solely for refusing to commit the illegal act and must do so by a preponderance of the evidence.  *See Sabine Pilot*, 687 S.W.2d at 735.

Section 32.46 of the Texas Penal Code is the only provision upon which Klumpe relies in making his *Sabine Pilot* claim.[6]  It prohibits using deception to secure the execution of a document. *See* TEX. PENAL CODE ANN. § 32.46 (Supp. 2002).  The district court's charge to the jury, which is not challenged on appeal, mirrors § 32.46.  It says: "A person commits an illegal act if, with intent

---

[6]  As an aside, we note that Texas law makes it illegal to fire or discriminate against an employee who has filed a workers' compensation claim.  *See* TEX. LABOR CODE ANN. § 451.001 (1996).  The same law does not apply to non-subscribing employers, however. *See Tex. Mex. R.R. Co. v. Bouchet*, 963 S.W.2d 52, 55-56 (Tex. 1998).  Further, there is no common-law exception to the rule of at-will employment which protects the employees of non-subscribing employers against similar retaliation.  *See Watkins v. Diversitech Corp.*, 988 S.W.2d 440, 441 (Tex. App.--Houston [1st Dist.] 1999, pet. denied).  Hence, co-workers like Klumpe are not protected against retaliation either.

to defraud or harm any person . . . he, by deception, causes another to sign or execute any document affecting the pecuniary interest of any person.  Committing such an act subjects the violator to criminal penalties."

In its order granting IBP judgment as a matter of law, the district court determined that there was no evidence of deception or that the deception (if any) would have caused Escamilla to sign the waiver.  Specifically, the district court said:

> [T]he failure to elaborate on mentioned programs or the inconsistencies in contractual documents in question do not by themselves constitute deception that would support a criminal prosecution under Texas Penal Code Section 32.46 against Klumpe if he obtained the waiver. The record in this case is devoid of evidence that those omissions or discrepancies were likely to affect the judgment of Escamilla in the case before this Court.  Essential elements of a violation of Section 32.46 are missing.

IBP also argues that there is no evidence that the sole reason Klumpe was fired was his refusal to get Escamilla's release.

## I.

The jury could rightly conclude that Klumpe was fired for not getting Escamilla's release.  First, the record suggests that the stated reason for Klumpe's termination was pretext.  Klumpe discussed with his supervisor the subpoena in the Escamilla suit.

-7-

Having apparently resolved Suther's objection to releasing the subpoenaed documents, Klumpe forwarded them to his attorney. IBP argues that turning over the crewing guidelines for the entire plant far exceeded the scope of the subpoena, which requested only the guidelines related to the hock cutter. But IBP's attorney never told Klumpe which documents to bring to the deposition, instead letting Klumpe decide for himself what was responsive to the subpoena. IBP also argues that Klumpe should have waited until Monday to hand over the documents. IBP knew, however, that Klumpe had hired an attorney to represent him in the Escamilla suit. In a letter Blackburn had advised IBP that IBP personnel should refrain from discussing the Escamilla suit with Klumpe unless he was present. Thus, IBP should have known that Klumpe would make available to his own attorney the subpoenaed documents and that he would do so before he was scheduled to be deposed on Monday. Nor should IBP have been surprised to learn that Blackburn sent copies of the subpoenaed documents to the other attorneys in the case, as he was required to do under the Texas Rules of Civil Procedure.

Second, the jury could conclude that IBP attempted to pressure Klumpe into getting Escamilla's waiver. Klumpe testified that immediately after the accident he was met at the hospital by IBP employee Terry Zimmerman. Zimmerman told him that unless the release was signed Escamilla's medical bills would go unpaid. There was also evidence that Zimmerman had been

confrontational in extracting a waiver from another injured IBP employee. A week after the accident, Klumpe met with Suther to see what the company intended to do for Escamilla. Klumpe testified that Suther threatened to fire him unless he got Escamilla to sign the waiver.[7] Although Suther denied making any threats, the jury could have simply chosen to believe Klumpe instead.

Third, the jury could find that IBP was motivated to get Escamilla's waiver by any means necessary. The evidence showed that an injury virtually identical to Escamilla's had occurred several years before. Andres Estrada, like Escamilla, lost three fingers while operating a hock cutter. Following the Estrada incident, IBP automated the cutters, but later concluded that they did not work as well as the manual ones and switched back. Unlike Escamilla, Estrada elected to receive benefits under WISP, thus waiving his right to sue. Estrada received a total of $77,000--$65,000 for medical expenses, and $12,000 in lost wages. Knowing that the hand-held hock cutters had an established history of causing severe injury, IBP had an incentive to secure Escamilla's waiver before he had a chance to sue. The amount of

---

[7]

    Q:   [D]id Mr. Suther ever specifically talk to you
         about the waiver?
    A:   Yes.
    Q:   What did he tell you?
    A:   He told me that I will get that waiver signed or I
         will--I will fire your F---ing ass. . . .

Escamilla's settlement, as compared to what Estrada got, is evidence of the exposure IBP was facing. And so, too, is the fact that the company sought out Klumpe to get the waiver, rather than Escamilla's own supervisor or someone besides a close relative.

In sum, the record would allow the jury to conclude that Klumpe was not in fact fired for disclosing confidential IBP documents, and that IBP had a compelling motive to get Escamilla's waiver and aggressively sought it. Besides the incident with the crewing guidelines, there was no material evidence of any misconduct during Klumpe's 15 years' at IBP, and as stated, no other reason was given for his termination. Viewing these facts together, the jury could infer that Klumpe was fired solely for not getting the waiver.

## II.

Although the jury could find that IBP fired Klumpe solely for refusing to get Escamilla's waiver, there is insufficient evidence that Klumpe would have committed an illegal act had he instead agreed to try. Section 32.46 requires deception. In its charge, the district court defined "deception" to include:

1.) Creating or confirming by words or conduct a false impression of fact that is likely to affect the judgment of another in the transaction, and that the actor does not believe to be true;

2.) Failing to correct a false impression of fact that

-10-

is likely to affect the judgment of another in the transaction, that the actor previously created or confirmed by words or conduct, and that the actor does not now believe to be true; [or] . . .

. . . .

4.) Promising performance that is likely to affect the judgment of another in the transaction and that the actor does not intend to perform or knows will not be performed . . . .

Thus, to be convicted under § 32.46 the defendant must have at least created a false impression or made an illusory promise. Klumpe argues that there are at least three areas in which the SPD and orientation script make deceptive representations.[8] If we conclude that there is no evidence that either document in fact makes such misrepresentations, a prosecution under § 32.46

---

[8] Even if the SPD and orientation script in fact are deceptive, IBP argues that Klumpe did no act to create the deception. If IBP is correct, however, Klumpe could still have been held responsible for violating § 32.46 as an accomplice. *See* TEX. PENAL CODE ANN. § 7.02(a)(2)(1994)("A person is criminally responsible for an offense committed by the conduct of another if . . . acting with intent to promote or assist the commission of the offense, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. . . ."). At the same time, we note that the jury in this case was never instructed on accomplice liability. Under Texas law, the jury is not free find the defendant guilty as an accomplice unless the court's instructions authorize it to do so and include the essential elements of proof for making such a finding. *See Plata v. State*, 926 S.W.2d 300, 304 (Tex. Crim. App. 1996). Thus, to sustain his *Sabine Pilot* claim Klumpe had to prove that his conduct alone would have constituted an offense under § 32.46.

could not be sustained.  And unless there is proof that seeking

Escamilla's release would have been unlawful under § 32.46, IBP's

firing Klumpe for refusing to try does not give rise to a *Sabine*

*Pilot* claim.  We will examine the SPD and orientation script in

some detail.

The first alleged deception concerns the provision of

lifetime benefits for injured workers.  Klumpe contends that the

SPD promises such benefits, but that WISP in fact provides them

only under strictly limited circumstances, and even then only for

a maximum of 401 weeks.  The SPD describes the "kinds of

payments" the plan provides, beginning with short-term benefits.

The first kind is "Temporary Disability Payments," which are

provided until the worker reaches maximum medical improvement.

Second is "Impairment Payments," which are provided in cases

where the worker has been permanently disabled.  The specific

amount paid for impairment depends on "the percent of impairment

to the body as a whole."  Third, the SPD promises "Supplemental

Payments," which make up for the difference between the worker's

pre-injury and post-injury income.  The SPD does not specify the

length of time for which IBP is responsible for payments of the

first three kinds.  The existence of the last category of

payments, entitled "Lifetime Payments," however, indicates that

the other payments do not continue for the life of the injured

employee.  According to the SPD, to receive lifetime payments the

injured employee must be "unable to return to any work whatsoever"--a prerequisite that suggests a severe disability. Six disability categories qualify for lifetime payments.[9]  For these, there is no dispute that IBP is bound to provide lifetime benefits.  It is for the other types of payments that the maximum outlay is 401 weeks.  We conclude that the SPD is not deceptive in describing the lifetime benefits.

The second alleged misrepresentation regards WISP's arbitration provision.  The orientation script states that IBP is "bound to honor" the decision of a "neutral arbitrator" regarding an injured employee's coverage under the plan.  The SPD makes similar representations.  It is undisputed that neither the SPD nor the orientation script nor the plan itself expressly permit appeal from the arbitrator's decision.  Klumpe argues that IBP does not consider itself bound by an arbitrator's decision, and he points to a recent example in support of his contention.  The

---

[9]  Section 3.16 of the plan provides:
(a)  Settlement Payments shall be paid until the death of the Employee for:
    (1)  total and permanent loss of sight in both eyes;
    (2)  loss of both feet at or above the ankle;
    (3)  loss of both hands at or above the wrist;
    (4)  loss of one foot at or above the ankle and the loss of one hand at or above the wrist;
    (5)  an injury to the spine that results in permanent and complete paralysis of both arms, both legs, or one arm and one leg; or
    (6)  an[] injury to the skull resulting in incurable insanity or imbecility.

jury heard evidence that former IBP employee Michael Glover agreed to proceed under WISP, but was dissatisfied with IBP's treatment of his claim for benefits. He sought to have his claim reviewed by a neutral arbitrator in accordance with WISP's provisions. The arbitrator found for Glover, but IBP refused to honor the arbitrator's decision, claiming that the arbitrator had exceeded his powers.[10]

The Federal Arbitration Act ("FAA") governs actions to enforce an arbitration clause in cases in which the district court has original jurisdiction. *See Bank One, N.A. v. Shumake*, 281 F.3d 507, 513 (5th Cir. 2002). Under the Act, an arbitration agreement is enforceable unless "such grounds exist . . . for revocation of the contract." 9 U.S.C. § 2. One such ground is where the arbitrator has exceeded his powers. *See id.* § 10(a)(4). In that case, the aggrieved party may petition the district court to vacate the award. *See id.* By contracting for arbitration, "It is presumed that the parties intended to relinquish their right to appeal the merits of the dispute, not their right to appeal an arbitration award that resulted from the arbitrator's abuse of authority or bias." *Team Scandia, Inc. v. Greco*, 6 F. Supp. 2d 795, 798 (S.D. Ind. 1998). The parties

---

[10] Glover succeeded in enforcing the arbitrator's decision in federal district court. IBP has taken an appeal from that court's judgment, *see Glover v. IBP, Inc.*, No. 02-10277 (5th Cir.), and continues to argue that the arbitrator exceeded his authority, *see* Appellant's Br., passim.

cannot opt out of the FAA unless they clearly state their intent to do so. *See Roadway Package Sys., Inc. v. Kayser*, 257 F.3d 287, 294-95 (3d Cir. 2001)(Becker, C.J.)(construing *Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52 (1995)). In this case, we see no evidence that the parties sought to require arbitration under provisions different than those in the FAA. We therefore conclude that IBP's appeal in Glover's case does not make the SPD or orientation script deceptive.

Finally, we turn to Klumpe's allegation regarding IBP's "Restricted Duty Program." According to the orientation script, an injured worker "will be assigned to the restricted duty program in accordance with the restrictions assigned by your doctor." The script says nothing further about this program, and the SPD says nothing about it at all. Restricted duty is available until the injured employee reaches "maximum medical improvement." Thereafter, the employee has thirty days to find and bid on a job at IBP that is concomitant with his disability. If he cannot find such a position, the employee is put on unpaid leave. While on leave, he may bid on any position for which he is qualified that becomes available. If he cannot find a suitable position within one year of being put on leave, the employee will be terminated.

At trial, Klumpe introduced evidence showing that the restricted duty program can have a severe effect on an injured employee. Andres Estrada testified that union rules did not

permit him to bid for a position unless he had seniority over other qualified employees. Not surprisingly, light-duty work was the most sought after at IBP. To qualify for a more strenuous position, Estrada had to lie about his disability. Working at IBP was difficult without the use of both hands. Later, Estrada was returned to the hock cutter, but found it difficult (mentally and physically) to use the same machine that cut off his fingers. Never having found another satisfactory position at IBP, he eventually had to quit.

We agree with the district court that the SPD and orientation script were not deceptive for failing to include more information about the restricted duty program. The restricted duty program is not part of WISP. It was the product of an agreement between IBP and the worker's union. Whether or not an injured employee elects to receive benefits under WISP, he must find a compatible position within thirty days of reaching maximum medical improvement. Failure to find a position will not affect the employee's eligibly for disability payments unless he refuses to accept suitable employment. WISP is intended to be an alternative approach for compensating workers for on-the-job injuries; the restricted duty program, on the other hand, is a means for reintegrating them into IBP's workforce. Neither directly depends on how or whether an employee proceeds under the other.

The foregoing notwithstanding, Klumpe claims that IBP

management themselves admitted that the SPD and orientation script are deceptive and that employees have in fact been misled. Based on our own careful review of their testimony, we cannot agree. Suther, for example, merely admitted that none of the WISP documents discuss the restricted duty program--a fact that does not make them deceptive. He also conceded that the WISP documents do not expressly permit appeal from an arbitrator's decision. As we have already shown, however, even a binding arbitration can be challenged on certain narrow grounds, at least unless otherwise stated. Nor did Missy Britt, an IBP nurse, or Barbara Lingenfelter, IBP's safety manager, admit to knowing of or making any misrepresentations or that their supervisors at IBP encouraged them to do so. At most Britt's testimony shows that she never elaborated on WISP's lifetime payment provision or on the restricted duty program, that not being her job. Lingenfelter stated that she did not advise employees that they might receive more if they sue rather than accept benefits under WISP. But the record does not show that she made a contrary suggestion, or that she ever discouraged employees from speaking with an attorney about suing IBP instead.[11]

## CONCLUSION

---

[11] The only evidence we found of an IBP employee having admitted to misrepresentations came from Klumpe's own testimony. He testified that in his meeting with Suther following Escamilla's incident, James Crow, another IBP supervisor, told Klumpe that IBP would "f--- him over just like we do everyone else."

The judgment of the district court is AFFIRMED.[12]

---

[12] IBP also argues that Klumpe's *Sabine Pilot* claim is preempted by the Employee Retirement Income Security Act, and that punitive damages are unavailable in this case or, alternatively, are subject to a statutory cap. Having determined that there was no evidence of deception, we need not reach these points. Nor need we take up the district court's determination that the deception (if any) would not have caused Escamilla to execute the waiver.

*Judge Ellison dissenting*:

While I concur with much of the majority's well-written opinion, I dissent on one critical issue. Specifically, I believe the record does not support the district court's take-nothing judgment which was predicated on the theory that no reasonable jury could have concluded that the act of securing Escamilla's release would have been a crime.

## I. The Legal Standard for Judgment as a Matter of Law

This Court properly reviews *de novo* the district court's ruling on a motion for judgment as a matter of law ("JMOL"), applying the same legal standard used by the district court. *Coffel v. Stryker Corp.*, 284 F.3d 625, 630 (5th Cir. 2001) (citing *Flowers v. S. Reg'l Physician Servs.*, 247 F.3d 229, 235 (5th Cir. 2001)). "Although our review is *de novo*, . . . our standard of review with respect to a jury verdict is especially deferential." *Flowers*, 247 F.3d at 235 (internal quotations omitted) (quoting *Brown v. Bryan County, Okla.*, 219 F.3d 450, 456 (5th Cir. 2000), *cert. denied*, 532 U.S. 1007 (2001)). Therefore, JMOL should only be granted if the facts and inferences point so strongly and overwhelmingly in the movant's favor that reasonable jurors could not reach a contrary conclusion. *Id.*

Under Federal Rule of Civil Procedure 50, "judgment as a matter of law is proper after a party has been fully heard by the jury on a given issue, [if] there is no legally sufficient evidentiary basis for a reasonable jury to have found for that party with respect to that issue." *Ford v. Cimarron Ins. Co..* 230 F.3d 828, 830 (5th Cir. 2000) (internal quotations omitted) (quoting *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 804 (5th Cir. 1997)). In entertaining a Rule

50 motion, the court must review all of the evidence in the record, and draw all reasonable inferences in favor of the nonmoving party. *Ellis v. Weasler Eng'g, Inc.*, 258 F.3d 326, 337 (5th Cir. 2001), *as amended*, (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000)). The court may not make credibility determinations or weigh the evidence, as "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Reeves*, 530 U.S. at 150-151 (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986)). Thus, in reviewing the record as a whole, the court must disregard all evidence favorable to the moving party that the jury is not required to believe. *Ellis*, 258 F.3d at 337 (citing *Reeves*, 530 U.S. at 151).

## II.  The *Sabine Pilot* Criteria

In application to a *Sabine Pilot* claim, the trial court determines as a matter of law whether the provision at issue makes its violation a criminal offense, while the jury decides whether the employee's conduct would have been "an illegal act." *Sabine Pilot Service, Inc. v. Hauck,* 687 S.W.2d 733, 736 (Tex. 1985); TEXAS PATTERN JURY CHARGES—BUSINESS, CONSUMER & EMPLOYMENT PJC 107.3 (2000 ed.). The majority opinion rests on affirming the district court's reversal of the second of these steps. Although the majority concedes that a jury could have reasonably found that Klumpe was fired for not getting Escamilla's release,[13] the majority affirms the district court's finding that there is no legally sufficient evidentiary basis for a reasonable jury to find that seeking Escamilla's release would have been "an illegal act" had

---

[13] The majority also concedes that the jury could have reasonably decided that IBP's purported reason for Klumpe's termination – the removal of the crewing guidelines – was pretextual, that IBP attempted to put pressure on Klumpe to obtain Escamilla's waiver, and that IBP was motivated to get Escamilla's release by any means necessary.

Klumpe tried. I disagree that the standard of review for a JMOL has been met on this pivotal

issue. I would reverse the district court's grant of a JMOL and would reinstate the jury verdict.[14]

Klumpe bases his *Sabine Pilot* claim on section 32.46 of the Texas Penal Code, which

states in relevant part that "a person commits an offense if, with intent to defraud or harm any

person, he, by deception… causes another to sign or execute any document affecting property…

or the pecuniary interest of any person." Thus, in order to find that Klumpe would have

committed an illegal act had he sought Escamilla's release, the facts presented at trial must have

been sufficient for a reasonable jury to find that such an act would have necessarily involved

deception.

As amended effective May 21, 1997, section 32.46 adopts the definition of "deception"

contained in Texas Penal Code § 31.01, which states in relevant part:

(1)     "Deception" means:
(A)     creating *or confirming by words or conduct* a false impression of law
        or fact that is likely to affect the judgment of another in the transaction,
        and that the actor does not believe to be true; [or]
(B)     failing to correct a false impression of law or fact that is likely to affect the
        judgment of another in the transaction, *that the actor previously created or
        confirmed by words or conduct*, and that the actor does not now believe to be
        true[.] (emphasis added).

No evidence at trial supported a finding of deception under Texas Penal Code § 31.01(1)(B). [15]

Under Texas Penal Code § 31.01(1)(A), however, the jury could have reasonably found that

---

[14] Although I would reinstate the jury's verdict, I would review the amount of punitive damages and possibly reduce them to more closely established precedent. In view of the majority's opinion, I feel it unnecessary to analyze further the punitive damages issue, or to consider IBP's ERISA preemption argument in this dissenting opinion.

[15] The majority's opinion correctly states that Klumpe could have possibly faced liability under the Texas Penal Code § 31.01(1)(B) definition of deception had the jury been instructed on accomplice liability. Under Texas law, however, "the jury is not free to find the defendant guilty as an accomplice unless the court's instructions authorize it to so and include the essential elements of proof for making such a finding." *Plata v. State,* 926 S.W.2d 300, 304 (Tex. Crim. App. 1996). While such an instruction would have benefited Klumpe by providing an alternative basis for criminal liability under the statute, as discussed above it is not dispositive on the issue of liability as accomplicity is not required under 31.01(1)(A). TEX. PENAL CODE § 31.01(1)(A).

Klumpe would have been guilty of deception had he tried to obtain Escamilla's waiver. IBP claims that the statute requires *affirmative* deception on Klumpe's part. The plain meaning of the statute, however, does not contain this requirement. On its face, the statute merely requires "creating *or confirming* by words *or actions*." (emphasis added). TEX. PENAL CODE § 31.01(1)(A). For a finding of deception – and thus potential criminal liability – by seeking Escamilla's release Klumpe would have had to confirm by words or actions the representations made by IBP in the orientation script and the Summary Plan Description concerning the WISP program, and those representations must have actually existed and been known by Klumpe to be deceptive.

**III.  IBP's Deceptions**

As discussed in the majority opinion, new IBP employees receive a booklet containing a summary of WISP benefits, called the Summary Plan Description ("SPD") at orientation.  The script read by an IBP supervisor at that orientation states that the SPD "tells you just about everything you need to know about [WISP], including your rights and responsibilities."  However, the WISP legal document contains a longer and more detailed explanation of WISP benefits.  The WISP legal document is kept in IBP's Health and Safety Department, and is not provided to employees unless they request it.  The majority concludes that no inconsistencies exist between the orientation script, the SPD, and the WISP legal documents, and thus no deception could have occurred.  Not only do I disagree that no inconsistencies exist, but I particularly disagree that a reasonable jury could not have found the inconsistencies in the materials to be deceptive such that if Klumpe remained silent or encouraged Escamilla to sign the waiver, he would have similarly been deceptive.

The first alleged inconsistency concerns lifetime payments under WISP.  The SPD states that "if a covered injury or illness leaves you unable to return to any work whatsoever, the program provides lifetime payments."  The WISP legal document states that lifetime payments will only be given if the injury fits one of six categories enumerated in the legal document, such as total and permanent loss of sight in both eyes.  For other injuries not so enumerated, payment will not exceed 401 weeks.

While the majority concludes that the language concerning being "unable to return to any work whatsoever" is a prerequisite that suggests a severe disability, the six disability categories listed in the WISP materials are not exhaustive.  In particular, all but one of the six categories

-23-

cover only physical injuries. The sixth category does cover injuries "to the skull resulting in incurable insanity or imbecility," but there are a wide range of other work-related illnesses could leave a person unable to return to any work whatsoever. Debilitating clinical depression, for example, might well be the result of the injury that Escamilla suffered, and it would definitely not be covered. More importantly, a reasonable jury could find that the SPD was deceptive in this regard.

The second alleged inconsistency concerns the binding nature of arbitration under WISP. According to IBP's orientation script, "by the terms of the Program as submitted to and supervised by the United States Department of Labor, IBP is bound to honor the arbitrator's decision." The majority opinion notes that under the governing power of the Federal Arbitration Act, parties retain the right to appeal an arbitration award that results from the arbitrator's abuse of authority or bias, as was the case in the Glover complaint presented as anecdotal evidence of this misrepresentation at trial. *Team Scandia, Inc. v. Greco,* 6 F.Supp.2d 795, 798 (S.D. Ind. 1998). Nevertheless, an IBP managerial employee, James Crow, testified that nowhere in the IBP documents does it state that IBP can appeal the decision if it decides to do so. Nor could I find any reference in my review of the documents submitted to this Court.[16] Whether or not an abuse of the arbitrator's authority existed in Glover's case, testimony at trial concerning Glover merely illustrated and provided for the jury sufficient evidence to find that, despite telling employees that IBP is bound to honor the arbitrator's decision – without any mention of exceptions – IBP can and does appeal arbitration decisions.[17]

---

[16] These documents included the orientation script, the SPD, and the WISP legal document.

[17] In fact, the orientation script states that "because the appeal process [to a neutral arbitrator] is fairly simple, an attorney's service is usually not needed unless you want to hire one." The help of an attorney would almost certainly be needed if IBP appealed an arbitrator's decision. This kind of statement in the orientation script only adds to the list

The final deception concerns the "Restricted Duty Program." New employees are told that, if they are injured on the job, IBP will assign that employee "to the restricted duty program in accordance with the restrictions assigned by your doctor." However, the program includes deadlines not disclosed to the employees during orientation. For example, once the employee reaches "maximum medical improvement," the employee has thirty days to find a job within the plant that will meet the restrictions imposed by the treating physician. If the employee cannot find a job within that thirty-day period, then the employee is placed on a twelve-month leave of absence without pay. If the employee cannot find a job within that twelve-month period, the employee is terminated.

While the Restricted Duty Program is not part of WISP, Klumpe nonetheless presented evidence at trial concerning the program that adequately demonstrated IBP's failure to provide full disclosure of its terms. This evidence, combined with the above discussed inconsistencies, was clearly enough for the jury reasonably to conclude that deception would have occurred had Klumpe sought Escamilla's release because the information given to IBP employee's concerning the WISP program and the Restricted Duty Program was misleading and deceptive. Thus, in order to secure Escamilla's signature, Klumpe would have had to "confirm" the benefits of the program by remaining silent about how the program really worked.[18] Klumpe testified that no

_____

of evidence the jury could have used in determining the SPD and orientation script were deceptive.

[18] In order to illustrate how the program affected an employee who sustained an injury, Klumpe presented the testimony of Andres Estrada, an IBP employee who suffered an injury very similar to Escamilla's approximately two years prior to Escamilla's accident. After his injury, Estrada signed a waiver, and ultimately received approximately $77,000 in compensation from IBP. Escamilla, in contrast, received approximately $1.9 million from IBP in settlement of his personal injury suit. Estrada also testified regarding the difficulties he encountered returning to work at IBP after his injury, specifically as a result the time deadlines and placement limitations of IBP's restricted duty program. Estrada's experience under WISP and the restricted duty program demonstrated the limitations of those benefits for an individual with Escamilla's injury, particularly when considered in light of the significantly greater recovery obtained by Escamilla as a result of his personal injury suit.

one with an injury such as Escamilla's would sign the waiver if he were aware of the misrepresentations made to him, and of the actual benefits available under WISP and the restricted duty program. This evidence presented by Klumpe is sufficient to support an inference that Escamilla would not have signed a waiver if the benefits available under WISP and the restricted duty program had been fully and accurately presented to him.

Moreover, Klumpe presented evidence at trial that, IBP did not correct the inconsistencies between the information presented to new employees at orientation and the actual benefits available to them under WISP and the restricted duty program. For example, IBP employee Missy Britt testified that she was the first person who generally would consult with an injured worker about signing the waiver. Britt also testified that she did not discuss any of the differences between actual benefits provided and the orientation information, and did not discuss the time limits associated with the Restricted Duty Program when consulting with an injured worker. Klumpe himself also testified that, as an IBP manager, he previously had secured waivers from employees without correcting any of the misrepresentations made during orientation, and that he was fully aware that IBP wanted the waivers signed and did not want any misrepresentations to be corrected. Estrada and Glover gave anecdotal testimony concerning the Restricted Duty Program, both relating their experiences that the program did not function as stated in the orientation script or the SPD. Glover also testified that IBP appealed the arbitrator's decision in

his case, something he did not believe was a possibility according to the materials he had received. Finally, Suther admitted in his testimony that employees were misled during orientation.[19]

## IV.  The Property Interests at Stake

An offense under section 32.46 is not complete until a document that would affect property or a pecuniary interest is executed.  *Goldstein v. State*, 803 S.W.2d 777, 789 (Tex. App.—Dallas 1991, pet. ref'd) (citing *Mills v. State*, 722 S.W.2d 411, 416 (Tex. Crim. App. 1986)).        The terms "property" and "pecuniary interest" are not defined under section 32.46, and therefore are to be given their plain and ordinary meanings.  *Goldstein*, 803 S.W.2d at 791 (citing *Floyd v. State*, 575 S.W.2d 21, 23 (Tex. Crim. App. 1978).  The term "property" in section 32.46 encompasses an individual's cause of action against another person under the law. *Fisher v. State*, 803 S.W.2d 828, 830 (Tex. App.—Dallas 1991, pet. ref'd) (citing BLACK'S LAW DICTIONARY 1095 (5th ed. 1979)).  By signing the waiver, Escamilla would have relinquished his personal injury cause of action against IBP, and therefore the waiver would have affected his "property," irrespective of the outcome of any such lawsuit.  Furthermore, in a situation where the outcome of a lawsuit was just as speculative as Escamilla's personal injury suit viewed *ex ante*, a Texas appellate court has found that even potential legal liability affects an individual's pecuniary interest so as to justify conviction of securing execution of a document by deception. *Id*.  The stipulated facts alone therefore are sufficient to support the jury's finding that executing the waiver would have affected Escamilla's property and/or pecuniary interest, as required to constitute a violation of section 32.46.

## V.  The Evidence Supporting the Jury's Verdict

---

[19] Suther, in his testimony, admitted that IBP's orientation and SPD materials were false if IBP was seeking to vacate the arbitrator's decision in the Glover case, which the record reflects as true.

Because a *Sabine Pilot* cause of action will always involve an unconsummated crime, any testimony about what Escamilla would have done, and why he would have done it, had Klumpe asked him to sign the waiver inevitably would be speculative. Moreover, if done with the intent to defraud by deception, any attempt Klumpe would have made to secure Escamilla's signature on the waiver would have subjected Klumpe to criminal liability, whether or not that attempt ultimately proved successful. *See* TEX. PENAL CODE § 31.01(1)(A). Klumpe meets his *Sabine Pilot* burden only if he showed that IBP required him to commit a criminal violation in order to keep his job; a showing that Klumpe had a good-faith belief that the required conduct would constitute a violation of criminal law will not suffice.[20] *Williams*, 2000 WL 31802 at *3.

Contrary to the district court's holding that "[t]he record in this case is devoid of evidence that those omissions or discrepancies were likely to affect the judgment of Escamilla in the case before this Court," the evidence was sufficient to support an inference that, if asked by Klumpe, Escamilla would have signed the waiver in reliance on misrepresentations made by IBP.[21] The

---

[20] Because the *Sabine Pilot* standard is an objective one, i.e. did the employer require the employee to commit a crime or face termination, the suggestion running through IBP's pleadings and the district court's opinion that Klumpe's claim is somehow tainted because his true motivation was loyalty to his stepson, not fear or criminal prosecution, is irrelevant. Even if such a factual inference were consistent with the jury's verdict and thus could be considered by the Court, Klumpe's subjective motivation for refusing to obtain Escamilla's signature does not affect his *Sabine Pilot* claim.

[21] IBP itself cites the following exchange from the record:

testimony of the person who signed the relevant document is not required to prove a violation of section 32.46. *Smith v. State*, 681 S.W.2d at 74. The testimony of another person who, based on his personal knowledge, is competent to testify about the state of mind of the signor, is legally sufficient to support a conviction. *Id*. In the instant case, the jury could reasonably have inferred that Klumpe had personal knowledge of Escamilla's state of mind after the injury, as Escamilla was Klumpe's stepson. Klumpe testified that no one with Escamilla's injury would have signed the waiver if the benefits actually available under WISP and the restricted duty program had been known to that person, and that Escamilla, having had the available benefits misrepresented to him, would have signed the waiver if Klumpe had asked him to do so.

Furthermore, the inconsistencies between the orientation materials and actual plan benefits adduced by Klumpe are sufficiently material to support an inference of reliance. Although the availability of lifetime benefits for total permanent disability arguably would not have influenced Escamilla's decision regarding the waiver due to the nature of his injury,[22] whether arbitration would have been binding if any dispute over Escamilla's benefits under WISP arose is an issue

---

Q: Do you believe if you had gone to Chris and asked him to sign the waiver that we would have signed it?
A: Sure he would have.

In the context of Klumpe's testimony in its entirety, this statement does not necessitate an inference that Escamilla would have signed the waiver, irrespective of the misrepresentations allegedly made to him, simply because his stepfather asked him to do so. However, when viewed in the light most favorable to Klumpe's case, it does seem to indicate, misrepresentations having previously been made by others, that Klumpe simply would have had to maintain his silence – knowing of the misrepresentations – and that Escamilla would have signed the form upon being asked to do so by his stepfather.

[22] For example, despite the severity of Estrada's injury, almost identical to the one suffered by Escamilla, he did return to work. Further testimony by Estrada revealed, however, that he had to eventually terminate his employment with IBP because of an inability to find suitable work there following his injury. Thus, although the availability of lifetime benefits for total permanent disability arguably would not have influenced Escamilla under the definition of qualifying injuries provided in the complete WISP document, it is conceivable that Estrada's experience could have lead Escamilla to question his ability to find work after such an injury.

that cuts across all covered injuries. The jury reasonably could have inferred that an individual with an injury as serious as Escamilla's would have found this latter fact material to his decision whether to accept WISP benefits.

In addition, based on Estrada's testimony regarding his experience with the Restricted Duty Program, the jury also could have inferred that the misrepresentations regarding that program would have been material to Escamilla's decision. The majority opinion counters that the Restricted Duty Program is separate from the WISP, and that signing the waiver is not an agreement to participate in restricted duty. But by signing the waiver, Escamilla would have relinquished his right to seek damages for future lost earnings after maximum medical improvement if he could not secure a placement within the program's time limitations. Escamilla had not been informed of those time limitations, and did not understand how they might have affected the amount of his future lost earnings. Accordingly, IBP's misrepresentations about the benefit actually available under the Restricted Duty Program reasonably could be believed to have a direct impact on Escamilla's willingness to sign the waiver.

## VI. The Roles of Jurors and Judges

In conclusion, the evidence presented at trial does not meet the standard for a JMOL. Rather, the jury had enough legally sufficient evidentiary support to reasonably find in Klumpe's favor. Assessing credibility and making factual determinations are uniquely within the province of the jury. The jury hears and sees witnesses and evidence first hand – a privilege that is forever lost when trial ends. Thus, when the majority writes that "the only evidence we found of an IBP employee having admitted to misrepresentation came from Klumpe's own testimony"[23] (a proposition I reject), it fails to explain why Klumpe's testimony would not be sufficient for the jury. The jury can reasonably decide who to believe, and who to disbelieve. If judges are willing to set aside jury verdicts as readily as was done in this case, the entire rationale for the civil jury system is sharply attenuated. At a practical level, trial judges can no longer be credible in explaining to jurors that – although their service comes at a significant personal cost to them, their families, and their co-workers – the contribution they make is indispensable.

This case is peculiarly ill-suited to have judges substitute their opinions in place of the jurors' verdict. We can leave aside for the moment the fact that the jury listened to nine days of testimony and deliberated for one more day. We can likewise discount the obvious fact that all jurors were able to judge the demeanor of the witnesses and then had the opportunity to compare their reactions. The key point is even more fundamental. Whether an employer's explanation of specific employee benefits is or is not deceptive is something that should be determined by men and women who are chosen from the community in which the conduct occurred and who likely have had relevant and diverse experiences in receiving explanations of employment benefits and

---

[23] Klumpe testified that in his meeting with Suther following Escamilla's injury, James Crow, another IBP supervisor, told Klumpe that IBP would "f--- him over just like we do everyone else."

subsequently trying to realize those benefits. In other words, such a determination is one for which a jury is quintessentially appropriate. Conversely, if any group is uniquely inappropriate to make such a determination, surely it is Article III federal judges who enjoy the otherwise almost unheard of luxury of lifetime job tenure and employee benefits many of which are backed by the full faith and credit of the United States.

A jury's verdict should be disturbed only when the stringent requirements of JMOL are met. They are decidedly not met in this case. Accordingly, I respectfully dissent, and would reverse the district court's decision and reinstate the jury verdict.